**FILED**

ROBERT BAKER
2069 N  Beverly Glen Blvd
Los Angeles, CA  90077
310-746-6191
310-234-1241(fax)
In Pro Per
robertbaker.executor@gmail.com

2012 JUL 31  AM II:08

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

fee paid
N/S

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

# CV12-6572-DDP (Ex)

| | |
|---|---|
| ROBERT BAKER Plaintiff, Individually, and, as an executor ; IN RE ESTATE OF KATE BAKER <br><br> Plaintiffs <br><br> vs. <br><br> AMERICAN EXPRESS, Inc.; AMERICAN EXPRESS FINANCIAL ADVISORS, Inc.; AMERIPRISE FINANCIAL, Inc.; AMERICAN EXPRESS TAX AND BUSINESS SERVICES, Inc.; STANLEY R COHEN; WILLIAM F. DAVIS, a professional law corporation; MATTHEW FAIRSHTER, a professional law corporation; JOEL R. BENNETT, a professional law corporation; DYKEMA GOSSETT, LLP, a professional law corporation; BENNETT & FAIRSHTER, LLP, a professional law corporation; BETTY CHIA, a professional law corporation; | CASE NUMBER: <br><br> COMPLAINT <br> (1) Sherman Act (15 USC §§ 1 and 2) <br> (2) Due process rights(14th & 5th amendments) <br> (3) RICO (18 USC §§ 1961 et seq). <br> (4) Elder Abuse  (Calif. W & I Code §§ 15600-15675) <br> (5) Obstruction of Due Administration of Justice (18 USC § 1503) <br> (6) Conspiracy to Obstruct Justice (42 USC § 1985) <br> (7) Breach of Fiduciary Duty <br> (8) Americans With Disabilities Act (42 USC § 12101 et seq.) <br> (9) Violations of Securities Act 1933-34(15 USC §§ 1 et seq) <br>  a . The Investment Advisors Act of 1940 (15 USC §§ 78aaa through 78111) |



JUL 3 1 2012

| | |
|---|---|
| POLLET, RICHARDSON & PATEL, LLP, a professional law corporation; MICHAEL D DONAHUE, a professional law corporation; LUAN PHAN, a professional law corporation; STEVEN C GLICKMAN, a professional law corporation; GLICKMAN & GLICKMAN, LLP, a professional law corporation; ANDREW J. STERN, a professional law corporation; ; DAVID MARH, a professional law corporation; SIMON LANGER, a professional law corporation; RICHARD ANTHONY MAHAVIER, a professional law corporation; STATE BAR OF CALIFORNIA; Defendants. | b. The Securities Investor Protection Act of 1970 (15 USC §§ 78aaa through 78111) (10) False Pretences /Conversion (11) Fraud/Deceit (12) Professional Legal Malpractice: Fraud (Business & Professions Code §6068) (13) Declaratory Relief **DEMAND FOR JURY TRIAL** |

NOW COME PLAINTIFFS, ROBERT BAKER, an individual and, as an executor, IN RE ESTATE OF KATE BAKER. and BOTH (hereinafter, "Plaintiff" and "ESTATE" and "PLAINTIFFS", respectively), allege as follows:

## I.  Nature of this Action

1.    This is an action that is based on two levels.  The first level is the wrongful conduct of American Express Financial Advisors/Ameriprise (AEFA/AMERIPIRSE),  American Express, Inc. (AMEX,)  American Express Tax and Business Services (AETBS), and their agents. The second level is the conspiratorial conduct of an elaborate and sophisticated  cover up using attorneys, both AEFA/AMERIPRISE's counsel,  Plaintiffs' lawyers from 2001 and the governmental agency officially known as the State Bar of California.(STATEBAR)

## II.   Jurisdiction and Venue

2.    The jurisdiction of this court is invoked and this action is instituted under the provisions of §§ 1331, 1332, 1337 and 1367 of Title 28. United States Code ( 28 U.S.C.  §§ 3331, 1332,1337 and 1367) and §§ 4.12 and  16 of the Clayton Act(15 U.S.C. §§ 15, 22, 26) ,  and  American with Disabilities Act   42 USC  §§ 12101   based on  federal question , regulation of commerce and supplemental jurisdiction. It is brought to declare the rights of PLAINTIFFS to recover damages sustained by PLAINTIFFS as a result of Defendants unlawful actions and to obtain injunctive and declaratory relief.

3.    28  USC § 1331 which gives districts courts original jurisdiction over civil actions arising under the Constitution , law or treaties of the Untied States

4.    28 USC § 1343 (3) and (4) which gives district courts jurisdiction over actions to secure civil rights extended by the United States government.

5.    28 USC § 1367, which gives the district court supplemental jurisdiction over state law claims.

6.    The matter in controversy exceeds the sum or value of $75,000 exclusive of interests and costs.

7.    Venue is proper in the Central District of California under § 12 of the Clayton Act (15 U.SC. § 22)  and   under 28 USC §1391 because  Defendants AMEX, AEFA, AETBS,  Ameriprise and the State Bar  transact business and are found within this District .

8.    Defendants AEFA has offices in the Central District of California and is qualified to do business in the State of California.  AEFA and Ameriprise have done and do substantial business in the Central District of California.  AEFA and Ameriprise, as hereinafter set forth, intentionally violated Sections 1 and 3 of the Sherman Act and the Racketeer Influenced and Corrupt Organizations Act through acts which, in part occurred in the Central District of California and which have already injured PLAINTIFFS in their trade and business.

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

3

9.     All of the law firms herein named have office in the Central or Southern District of California and are qualified to practice law in the State of California. Defendant State Bar has offices in the Central District of California   and are qualified to do business in the State of California.

## III.   Parties.

### Plaintiffs

10.     Plaintiff Robert Baker ("PLAINTIFF") was and is a resident of the State of California, County of Los Angeles during all times mentioned in this complaint.

11.     Plaintiff Estate of Kate Baker (hereinafter, "ESTATE") was formally created on August 1, 2001 by virtue of the Los Angeles County Probate Court order via the letters of testamentary.

12.     Plaintiff & ESTATE, (hereinafter, "PLAINTIFFS") is a combination of both Plaintiff & ESTATE.

13.     Kate Baker, an individual, was a resident of the State of California, County of Los Angeles at all times during the times mentioned in this complaint.

14.     Plaintiff is also suing as an executor, on behalf of the Estate of Kate Baker.

### Defendants

15.     William F. Davis (hereinafter, "DAVIS"), a professional law corporation.

16.     Matthew J. Fairshter (hereinafter, "FAIRSHTER") is a professional law corporation, and a partner in Dykema, Gossett and Bennett & Fairshter.

17.     Joel R. Bennett ((hereinafter, "BENNETT"') is a professional law corporation, and a partner in Dykema, Gossett and Bennett & Fairshter.

18.     Betty Chia, (hereinafter, "CHIA"), was an associate at Bennett & Fairshter and Dykema, Gossett during the time they represented Plaintiff.  CHIA

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

worked on all aspects of Plaintiff's legal situation; including: Probate case, NASD, Superior Court filings.

19.    Bennett & Fairshter, LLP, (hereinafter, "B&F") is a professional law corporation.

20.    Dykema, Gossett, LLP, (hereinafter, "DYKEMA") is a professional law partnership including professional law corporations.

21.    Michael O Donahue, LLP (hereinafter, "DONAHUE") is a professional law corporation.  DONAHUE was and is a partner in the law firm of Pollet, Richardson & Patel.

22.    Pollet Richardson & Patel, LLP (hereinafter, "RP") is a professional law partnership including professional law corporations.

23.    Luan Phan, (hereinafter, "PHAN") is a professional law corporation. PHAN was the managing partner at the time of RP representation of Plaintiff and ESTATE.

24.    Steven C. Glickman, (hereinafter, "GLICKMAN")  is a professional law corporation. LLP.

25.    Glickman & Glickman, LLP (hereinafter, "GLICKMAN & GLICKMAN") is a professional law partnership including corporations.

26.    Andrew J. Stern, (hereinafter, "STERN") is a professional law corporation.

27.    Simon Langer, (hereinafter, "LANGER) is a professional law corporation.

28.    Richard Anthony Mahavier, (hereinafter, "MAHAVIER") is a professional law corporation.

29.    American Express, Inc.  (hereinafter, "AMEX") is a Delaware corporation.

30.    American Express Financial Advisors, Inc. (hereinafter, "AEFA") is a Delaware corporation.

31.    Ameriprise Financial, Inc. (hereinafter, "AMERIPRISE") is a Delaware corporation.

32.    "AEFA/Ameriprise" refers hereafter collectively to the parties named in paragraphs 30 & 31.

33.    American Express Tax and Business Services, Inc. (hereinafter, "AETBS") is a Delaware corporation..

34.    State Bar of California, (hereinafter, "STATEBAR") is a governmental body, an administrative arm of the California Supreme Court.

35.    Stanley R. Cohen, (hereinafter, "COHEN") is an agent of AEFA/Ameriprise and as a financial and investment advisor.

## IV.    Common Allegations

36.    Plaintiff who was named an executor in the will of Kate Baker was adjudicated via the letters of testamentary.(Exhibit 1)

37.    Plaintiff suffered from a developmental disorder which caused him serious learning disabilities since childhood. Plaintiff went through a psychoanalysis for treatment for 10 years and has ,made substantial gains.(Exhibit 2)

### AEFA, Cohen's Involvement

38.    Plaintiff received a phone call from Cohen in early 1996 and was told that Kate Baker had moved her monies to AEFA and Plaintiff should to. Plaintiff was convinced to transfer his monies from and effectuated a transfer in the early part of 1996 from Bears Stearns to AEFA.. Plaintiff told Cohen what he wanted to invest in and Cohen stated he would.

39.    Plaintiff will give summary of the actions of AEFA from 1996 to Kate Baker's death on January 28, 2000 in the form of a summary that was given to Mahavier which he gave to Philip Aidikoff, a securities arbitration specialist who was becoming the expert on Plaintiff legal team under Mahavier and Harris.(Exhibit 3)

40. Kate Baker died on January 28, 2010, Plaintiff obtained the legal counsel of Maurice Katz and I Richard Ruman.. After having paid KATZ approximately $40,000 and RUMAN approximately $32,000, for advise and service Plaintiff knew he had to seek an expert in the field of probate and estate law.

## Clark Byam, Hahn & Hahn, Mitchell Silberberg & Knupp Involvement

41. Plaintiff contacted Clark R. Byam of Hahn & Hahn . Plaintiff asked Byam if he knew Allan Cutrow ("Cutrow") who was a partner at Mitchell, Silverberg and Knupp ("MSK"), and he stated he did. Plaintiff made an appointment to meet with Byam. Prior to the meeting, Plaintiff sent all of the legal documents he had obtained to Byam for review.

42. At the first meeting, Byam suggested that after his review of the documents Plaintiff had sent him he would render his advice. His advise was: first, he would get the documents necessary to see if Plaintiff had a case against AEFA and, second, he wanted to set up a meeting with Cutrow and my brothers Allen and Frank Baker. A meeting was arranged. After many months went by, Byam stated to Plaintiff that he had received the documents. By the time Byam informed Plaintiff that he had received documents, Plaintiff had already decided to have DAVIS represent Plaintiff in any lawsuits against AEFA and Stanley Cohen and not Hahn & Hahn.

43. During the summer of 2001, William C. Garr of Hahn & Hahn called Plaintiff to suggest a meeting to discuss their representation of Plaintiffs against AEFA. He told Plaintiff that he, Byam, and their expert had reviewed the documents and believed Plaintiffs had a strong case against AEFA. He explained on the telephone that they had never done a securities arbitration case but that he could keep it in the United States District Court. Garr did say he would send Plaintiff some promotional material. Plaintiff received the promotional material within a few days. He also stated to Plaintiff that he would send Plaintiff a few

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

names of securities arbitration specialists since Plaintiff was hesitant about Hahn representing him in a securities case in arbitration.

44.     By this time in late 2001,  Plaintiff had meet with DAVIS and after DAVIS had reviewed all documents and had Katie Bake(not related to the decedent Kate Baker) also to review documents wanted to represent Plaintiff in bringing lawsuit against AEFA for recovery on Plaintiff's personal account and the  Estate monies; the Baker Family Trust  & Baker Family Partnership. .

45.     In December, 2001 Byam suggested that there be two depositions, one of Plaintiff and one of Allen Baker.. Plaintiff suggested a deposition of COHEN but Byam instead  stated that could occur if a settlement could not be reached at the mediation  By this time, Plaintiff had chosen to have DAVIS represent Plaintiff on behalf as an individual and as an  executor.. The depositions would be confined to the Plaintiff's personal account at AEFA and then there would be mediation for a possible global settlement. At the mediation Byam strongly suggested that Plaintiff settle with Allen and Frank and enter into a  Settlement Agreement., The settlement was an agreement between Allen, Frank, and Robert Baker as partners, executors and trustee of the various family entities. After the settlement then Plaintiff was to bring an action for claims against  AEFA and COHEN.  The settlement agreement of 2002, specifically excluded from release AEFA and COHEN.  At the May 30, 2012 Superior Court hearing in Case #BC394851,  the court strongly implied that  Hahn & Hahn  may have received and reviewed  documents pertaining to the BFT and BFP  without disclosing or advising Plaintiff of such.   Part of the Settlement agreement was to create a Robert Trust  and to have CNB be the trustee, this  fact becomes relevant, in that in 2007, Plaintiff sought to terminate the Robert Trust at City National Bank(CNB) and would eventually lead to legal malpractice  lawsuit and discovery of Byam's perjury. It also leads to a report that Plaintiff filed against CNB for their unethical conduct and elder abuse while trustee.  The report was filed with

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

the federal regulators who regulate national banks: Office of the Controller of the Currency. . As far as Plaintiff knows it is ongoing.

46.     Plaintiff did receive a few name from William Garr of Hahn & Hahn of securities arbitration specialists in a few days along with the promotional material. Plaintiff decided to call and interview AIDKOFF, one of the names of an expert in securities arbitration.

47.     Plaintiff made an appointment and at the meeting gave Aidikoff a history of the case which up to that point in 2001 was basically some information about AEFA management of the money and a detailed family history. Aidikoff recommended that his office requests documents from AEFA on the Plaintiff personal account account. Having been in the legal system for some 12 years now and having an understanding of another law firm feeding or referring a case to another specialist and the referring law firm getting a referral percentage, Plaintiff can cow appreciate that Aidikoff may have already had some documents from either Hahn & Hahn and/or MSK that they received from AEFA counsel as stated in the Ameriprise Subpoena Objection stated below.. Aidikoff stated he knew Cutrow from being involved with the Jewish Federation of Los Angeles.. The documents for the Plaintiff's personal account came within a few months; more importantly, Aidikoff and his associates could see that Plaintiff had some communication problems and learning disabilities Aidikoff declined representation owing to the fact that Plaintiff would not be dependable witness in an NASD arbitration. In September, 2011, MAHAVIER did contact and discuss the legal situation again and agreed to be an expert Jane Baker's prepared a detailed summary with 2 CD's composed of hundred of AEFA's documents which was sent to Aidikoff. ( Exhibit 3)

48.     At the same time that Plaintiff was meeting with Aidikoff,. a family friend who was also a CPA and a stock broker, Robert Fenton, referred Plaintiff to the woman who had been his instructor to help him pass the stockbrokers tests,

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

Kate Baker . Plaintiff spoke to Katie Baker would refer Plaintiff to DAVIS in due course.

## Davis Involvement

49.      When Aidikoff declined representation of Plaintiff, he called DAVIS and set up a meeting. DAVIS gave all of the documents to KB who was a specialist in securities. After a detailed review of all documents which include Baker Family Trusts, Baker Partnership, DAVIS advised plaintiff he would file a lawsuit against AEFA and Stanley R. Cohen

50.      DAVIS filed the initial Superior Court lawsuit case # LC060762 in 2002. The AEFA and COHEN moved to compel to arbitration . In the initial lawsuit, DAVIS sued for only the RBT account informing Plaintiff that he would later add the ESTATE when he would file in the NASD. The court compelled the case to arbitration DAVIS specifically asked the court to stay the case until after the NASD ruling specifically to give DAVIS discovery since the NASD lacked discovery power which he knew was not true.   DAVIS filed the initial complaint in the NASD but did not name the ESTATE as a party.   In the amended complaint in the NASD, DAVIS did add Plaintiff as a beneficiary saying that was sufficient to collect damages for the Estate..   DAVIS voluntarily dismissed the superior court case in January, 2003 without informing Plaintiff. By late 2003, DAVIS advised Plaintiff he needed to get out because he was ill. The agreement with Davis was for 20% on contigency and a $10,000.00 non-refundable fee.

## Bennett & Fairshter, Dykema & Richardson & Patel Involvement

51.      Plaintiff was recommended to B&F by William Comanor. .  Comanor was a long time good friend of BENNETT of  B&F. Comanor was also a very long time good friend of Donahue a partner at R&P... Comanor had learned a great deal about the case from his then wife, Joan Miller. Plaintiff meet Joan Miller as a colleague at a mental health clinic where both were dong internships. . In late 2008,  Plaintiff would learn by way of the State Bar  website that at the

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

time of the Comanor referral in 2004, B&F had embezzled millions of dollars from their clients through forgeries and creating conflicts of interests in at least two other cases that B&F were handling for other clients.. Had the Plaintiff known that  or  the  STATEBAR were required that each lawyer inform their existing clients and/or future clients that an ongoing investigation(s) was in progress on the individuals Calbar site page, Plaintiff would never have retained them

52.     In September 2004 Plaintiff meet with B&F for their initial meeting, B&F took a complete legal and securities history. .  In September, 2004, Jane Baker reviewed the original Superior Court file (LC060762)and discovered the voluntary dismissal by Davis, When BENNETT discovered the dismissal,  he would say, "that's malpractice" a legal malpractice lawsuit against DAVIS  was never filed.. After reviewing the NASD file ,B&F started filing discovery motions to get documents on the Estate.. On May 30, 2012  in the Superior court case #BC 394851 the court would inform Plaintiff  that since the NASD lawsuit was only about Plaintiff's personal account, Plaintiff  was not entitled to any documents that concerned the Baker Family Trust(BFT) or Baker Family Partnership(BFP).  Plaintiff was charged approximately $150,000.00 by B&F.   .  During the summer of 2005, B&F substituted in from Hahn & Hahn upon behalf of Plaintiff as an executor in the Probate for the Estate.

53.     Plaintiff's wife Jane prepared a very detailed summary of the acts of B&F, DYKEMA, and R&P for the Renewal of the Motion for Reconsideration heard on May 30, 2012. (Exhibit 4)

54.     Also during this time, Plaintiff retained the services of forensic accountant Jim Gill on the advice of B&F and was charged approximately $150,000.00.  Approximately 85% of the fees charged by Gill were the result of forensic accounting services pertaining to the 1999 Will, Baker Family Trust

accounts and Baker Family Partnership accounts, which were not part of the NASD arbitration.

## Glickman Involvement

55.    On or about August 2006 Plaintiff was recommended  Glickman as a possible legal malpractice attorney .Glickman was very well known in the legal community as a former president of the Consumer Attorneys Association of Southern California as his father before him.  Plaintiff set up an appointment to meet with him.  At the meeting Plaintiff explained to him that he needed both a legal malpractice attorney and also an appellate lawyer.  Glickman referred Plaintiff to appellate attorney Delores Yarnall. GLICKMAN in late 2006 advised and compelled Plaintiff to go In Pro Se in the Probate Case as it was no longer necessary  to have an attorney representing on behalf of the Estate for two reasons. First, the legal malpractice lawsuit, if  it became necessary, would be on behalf of the Estate and second, if we needed to get documents, the legal malpractice  lawsuit would be the appropriate vehicle.  It was on May 30, 2012 the superior court  in Case #BC394851  Judge Susan Bryant-Deason informed Plaintiff  that the legal malpractice action was solely about the personal account of Plaintiff at AEFA and therefore, all documents pertaining to the BFT and BFP were irrelevant, and third only members of the bar could bring lawsuits on behalf of the Estate. Plaintiff had been advised by letter and email from B&F and Dykema counsel in February 2012, that only members of the bar could represent Estates.  All three facts, first, that the legal malpractice lawsuit was solely about Plaintiff's personal account at AEFA, the issue of obtaining documents  from AEFA/Ameriprise  through the legal malpractice  lawsuit , and third,, Plaintiff could recover damages of behalf of the estate were inconsistent to what GLICKMAN had advised Plaintiff on when Plaintiff was compelled to go In Pro Se in 2006.

56.    Plaintiff, on information and belief, alleges that Glickman entered into an agreement with Phan and R&P to deceive Plaintiff into believing that Glickman would be the legal malpractice attorney if the Appeal was lost, knowing all along the legal significance of the NASD ruling that he learned from Evans in September, 2006.

57.    In August, 2006, Yarnall called Plaintiff up to inform Plaintiff that she had received a bizarre phone call from Ameriprise counsel Lowery insinuating that Plaintiff had no case, that Plaintiff was crazy and Yarnall would be sued for filing a frivolous appeal. Lowery was trying to take advantage of the fact that Plaintiff had a developmental disorder with learning disabilities. Glickman stated he would contact attorney Phan of R&P. Glickman would receive a binder of some materials from R&P and stated to Plaintiff that Glickman contacted a securities arbitration expert Jonathan Evans With the information that Plaintiff was informed by the honorable Susan Bryant-Deason, Plaintiff now alleges, on information and belief, that an agreement was made between Glickman and Phan in that Glickman would not sue R&P or the individual attorneys at the firm, keep quiet abut the tolling of the Statute of Limitations of the NASD ruling. . Evans wanted $5000.00 to draft an opinion letter concerning a possible legal malpractice case. When the remititteur from the Court of Appeals came down in February, 2008, GLICKMAN demanded from Plaintiff $5000.00 for the expert, otherwise GLICKMAN would not file the legal malpractice lawsuit.

## Federal Bureau of Investigation Involvement

58.    In September 2007, Plaintiff had a discussion with Riverside Lead Elder Abuse District Attorney Tristan Sware regarding some legal documents that Plaintiff had showed him.. Sware responded saying that because of the national nature of the documents, Plaintiff should take this to the United States Attorneys Office.. Plaintiff asked for a name at the US Attorneys office and received a name. Plaintiff located the person in Washington DC as part of

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

Congress. After a few emails, the US attorney recommended Plaintiff to take the documents to the FBI because they are the investigative agency who does the investigation for the US. Attorneys office.. Plaintiff was advised that the FBI only takes an interest in a very small percentage of cases.. Plaintiff did take the documents to the West Los Angeles office of the FBI. Plaintiff dropped the documents off and discussed it with the FBI agent on duty. A few days went by and Plaintiff received a phone from special agent Steven Goldman. After a discussion on the phone,  Special agent asked my wife and Plaintiff for a meeting. At the meeting which lasted almost two hours. Goldman became very interested in Plaintiff's legal situation. He stated that he would find out were the attorney complaint that Plaintiff had filed against Bennett & Fairshter was in process. He also requested that Plaintiff send all old and new attorney complaints and any and all documents pertaining to Plaintiff's legal situation to him. He gave Plaintiff his FBI card with the fax number written in.  A few days later Plaintiff received a letter from the State Bar requesting that they wanted Plaintiff to come in for an interview to discuss the complaint Plaintiff had filed against attorneys B&F law firm.  Plaintiff made the appointment to see investigator Michael O. Chavez.. When Plaintiff entered the little interview room, Chavez informed Plaintiff that he had just talked to BENNETT who had told  Chavez that BENNETT had represented Plaintiff for only a few months. Plaintiff informed Chavez that was not the case. We discussed the case for over a period of two days and almost 4 hours.  At the end of the entire interview, Chavez informed Plaintiff that if they found that any attorneys committed criminal activities it would then be referred to the District Attorneys office. Exactly one year to the day of filing the original complaint Plaintiff received the letter saying that Chavez had found no problem with B&F actions. As requested by Special Agent Goldman, Plaintiff forwarded the  letter to the FBI.. Plaintiff has continued honoring the request to the present day and has forwarded all documents.

59. Plaintiff, on information and belief, alleges that the STATE BAR of California entered into an agreement with DYKEMA, who represented American Express to look the other way and find FAIRSHTER not guilty of criminal activity which was directly opposite the findings in a Federal court Sanction Order against FAIRSHTER.(Exhibit 4)

### Ameriprise contact with Plaintiff in 2008

60. After the legal malpractice case against B&F and Dykema Gossett had been filed in Superior Court on July 28, 2008, on August 18, 2007, Plaintiff received a phone call from AEFA/Ameriprise agent Timothy Swanson ("SWANSON") who stated that, "as a trustee", Plaintiff would want to know about their findings. A letter followed a few days later, stating that in 2007, AEFA/Ameriprise had performed an in house accounting for the taxable year of 2000, which showed that AEFA had overstated income to the IRS and the State of California, and that Plaintiff was entitled to a payment from Ameriprise to compensate for the personal income tax Plaintiff would have overpaid. The letter also stated that a check was enclosed, but there was no check inside. Plaintiff met with Jim Gill, who advised Plaintiff to advise GLICKMAN to send out a subpoena for the accounting. GLICKMAN stated to Plaintiff that in time he would. GLICKMAN did not send a subpoena. GLICKMAN had also advised Plaintiff as did all subsequent attorneys Stern, Langer and Mahavier that in legal malpractice cases there is no recovery for punitive damages in the underlying case.

61. Plaintiff sent a letter to SWANSON asking for documentation for the in house accounting and telling SWANSON that there was no check enclosed in SWASON's letter. SWANSON wrote back refusing to provide any documentation, and gave Plaintiff instructions on how to obtain money due Plantiff. There was no deadline set by Ameriprise for Plaintiff to claim his money. Plaintiff followed SWANSON's instructions to obtain Plaintiff's money,

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

but received no response.  Plaintiff left a voice message for SWANSON, but he did not respond.  Plaintiff then called the phone number for service that SWANSON had included in the instructions.  Plaintiff's call was directed to an agent who told Plaintiff he was an associate of SWANSON's.  This agent could not find any reason for delay and instructed Plaintiff to fax the request again to SWANSON, to be sure it had been received.  Several days later, Plaintiff received a letter from Ameriprise counsel demanding that he "cease and desist" any contact with Ameriprise, and telling Plaintiff that they had no information for him. Plaintiff has never received the money Ameriprise stated that they owed him.

62.     In August of 2008, Plaintiff advised GLICKMAN that the FBI had taken an interest in the legal situation.

## Stern's Involvement

63.     Plaintiff was referred to attorney Stern to handle another legal malpractice lawsuit against Hahn  & Hahn(BC408161). The deposition of Byam proved fruitful.  In material areas Byam made false statements concerning material issues. First,  Byam stated that his partner at Hahn, William Garr, after a review of the documents did not want to represent Plaintiff in a lawsuit against AEFA.  In fact Plaintiff has documents from Garr from 2001 which states that indeed, Hahn  & Hahn did want to represent Plaintiff.(Exhibit 5)   Plaintiff learned on May 30, 2012, that Hahn & Hahn  might have received documents from Ameriprise pertaining to the BFT, BFP which Byam neither disclosed and/or gave copies to Plaintiff during 2001-2004. .  Due to STERN's making false statements to the court in his Motion to Withdraw as Plaintiff counsel a mere three weeks prior co trial and that the court stated to Plaintiff that "you have to pay your lawyer" was the reason she allowed him to withdraw. Plaintiff, after the false statements were made by Byam, sought to get more documents which were never produced.   In the original consultation and a few subsequent meetings, Plaintiff gave Stern a very detailed history of the entire legal situation.  Within days,

STERN advised Plaintiff that he thought there were at least two very solid lawsuits.

64.    Plaintiff , on information and belief, alleges that Stern entered into agreement with Glickman to deceive Plaintiff into thinking that Stern was interested to combine the then non-existing Ameriprise State Case with the legal malpractice case on appeal(BC394851) and then claim for financial reasons he had to get out.

65.    In  2009 Stern filed a RICO  Federal Lawsuit (CV09-3179(GHK(FMOx) on behalf of Plaintiff.  Initially when Plaintiff consulted with STERN  Plaintiff informed. that Plaintiff had received the letter from AEFA/AMERIPRISE concerning the check for the refund from AMERIPRISE as a result of the tax audit in December 2007 for the year of 2000. This fact was prominent in the filing of the federal lawsuit. The  parties knew that Plaintiff was dependent upon the monies he got from his mother and from the 2002 Settlement Agreement and all of the trickle down monies he got along the way.  The plan was to suck every penny out of Plaintiff's pocket so Plaintiff would stop pursuing legitimate claims.

66.    GLCKMAN needed the $5000 by July 31, otherwise the tolling agreement that the defendants, DYKEMA and B&F had signed would end. Plaintiff was forced to settle with Allen and Frank regarding the Robert Trust that had been set up at CNB and give them a huge percentage that they would not entitled to. .

### Ameriprise counsel threatening forensic accountant Jim Sill

67.    During October, 2010,  Defendant AEFA/Ameriprise Counsel Lowery when AEFA/MERIPRISE was a defendant in the Amerprise State Case made a threatening phone call  to the forensic Accountant Jim Gill.(Exhibit 6)

### Stern's Involvement continues

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

68.     During STERN's representation of Plaintiff's lawsuits, we often would discuss the legal malpractice Bennett Case that was on Appeal.  Although it was GLICKMANS Case and would be GLICKMAN Case if Plaintiff won the Appeal, STERN made statements that he would like to combine the Ameriprise State Case with the Appeal case.  STERN had the Ameriprise c State case on a 20% contingency except for the non-refundable $5000.00.  After the filing of the Ameriprise State Case, Plaintiff paid STERN monies to effect proper service on the various parties for depositors.  The service was for a deposition to take place for Cohen which never happened prior to the demurring out of the Ameriprise Case.  This same happened in the Bennett legal malpractice case with regard to Cohen again in December, 2011 when Mahavier attempted service of process for a Cohen deposition. In August, 2005, the NASD ordered an immediate deposition of Cohen, it never took place.

69.     In late  2010 Plaintiff would contact Evans for the opinion letter and Evans would inform Plaintiff that Glickman sent him a fax in September 2006 with a copy of the NASD ruling and the fax stated to:  Review and call him. Plaintiff learned from EVANS in 2010 that EVANS did not draft an opinion letter and never received the $5000.00 from Glickman.  Within days of Plaintiff learning this fact, Plaintiff received a check for $5000 from Glickman.  The NASD ruling was based on Code Section 10305, which had two parts: 1)  The lawsuit had to be refiled in superior or federal court 2) The statute of limitations was tolled since the NASD complaint was filed.  Plaintiff's NASD complaint was filed in 2002.  This new information would have significant impact of the issue of Statute of Limitations.

70.     During the later part of 2010, STERN stated for financial reasons he needed to get out of all cases.  Plaintiff learned recently that attorneys(who are officers of the court)  need to get permission from the court to withdraw from a case... At first he stated he needed to get out; then he demanded to get out and

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

eventually threatened Plaintiff and attempted to extort monies from Plaintiff. Because of the treats, Plaintiff was forced to go In Pro Se on the Ameriprise State Case( During the last months of 2010 Plaintiff started to look around for other lawyers to take over the cases because GLICKMAN had been the original attorney.

## Marh and Langer's Involvement

71.     Plaintiff had been referred to attorney MARH.  After a couple of meetings Plaintiff signed the retainer agreement which provided for a non-refundable $3500.00 and 20%-34% of any settlement or judgment amount. The agreement included two cases: Case #BC394851 and Case #BC435030.  MARH then advised Plaintiff that attorney LANGER would be the person doing the discovery work. LANGER had been the attorney who had referred Plaintiff to MARH.  Plaintiff meet with LANGER and advised Plaintiff that he would immediately respond to the opposition discovery and then at the same time would begin serving discovery items on the opposition and AEFA/Ameriprise.  First order of business was  to draft the 4th amended complaint. While LANGER was preparing the 4th amended complaint, Plaintiff received an email, detailing the fact that LANGER could not understand why attorney FAIRSHTER had not be named as a defendant originally by GLICKMAN and why the ESTATE had not be named as a PLAINITFF also by GLICKMAN.   LANGER added both to the 4th amended complaint.   Also, LANGER removed the Elder abuse damage provision saying it didn't have to be in the complaint since the elder abuse was against the underlying case of AEFA/Ameriprise. This substantially affected the demand for damages that MAHAVIER  (Exhibit 7)

72.     Soon thereafter, LANGER informed Plaintiff by email that defendants were moving to strike FAIRSHTER as a named defendant. On May 30, 2012, Plaintiff would learn that defendants had actually moved to strike out not only FAIRSHTER but also  the ESTATE from the complaint and were successful

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

MARH knew that Plaintiff was frightened to go In Pro Se since Plaintiff was not a member of the bar and was unble to do competent discovery.  Soon after LANGER had produced the documents which were the result of Jane Baker's efforts , MARH started to attempt to extort monies from Plaintiff.  MARH attempted extortion would scare Plaintiff to find another lawyer which would be extremely difficult because of the deception by various parties.

73.    At the time of the attempted extortion Plaintiff started to interview attorneys to take over the case.  By this time, the Ameriprise State Case(BC 435030) had been demurred out, as the result of  actions of STERN, MARH, LANGER,  and  AEFA/.Ameriprise.

### Steven Lewis Goldblatt's involvement

74.    In late May, 2011 in the process of interviewing attorneys, Plaintiff discussed the case with securities arbitration/legal malpractice expert Steven Lewis Goldblatt from St. Louis, Mo.  Goldblatt informed Plaintiff  of the significance of the NASD ruling code § 10305. Goldblatt explained the § 10305 has two parts:  1) counsel must re-file in Superior Court or Federal Court, 2) The Statute of Limitations is tolled as of when the case was first filed in the NASD, in Plaintiffs case since 2002.  Goldblatt at that the time wanted to be retained either as counsel or as an expert.

### Superior Court Judge Orders Mediation in 2011

75.    The honorable Superior Court Judge Susan Bryant-Deason ordered mediation in early 2011 to occur prior to a hearing in June, 2011.  As of the May 30, 2012 hearing when Plaintiff learned that the legal malpractice lawsuit was solely about the Plaintiff Trust account. it was abundantly clear how contrived , deceitful,  and abusive  the mediation was.. It reminded Plaintiff of his first mediation back in 2001 which was also based in fraud now that Plaintiff knows that his own counsel Byam had deceived Plaintiff in material ways in order to

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

obtain the 2002 Settlement Agreement since Plaintiff had chosen DAVIS to represent Plaintiff in any further action against AEFA/Ameriprise. . In the deposition Plaintiff took back in 2001 which was an abusiveness deposition and should not have taken place had Byam not deceived Plaintiff and allowed Karl de Costa (MSK)who deposed Plaintiff to go into the personal history of Plaintiff which was irrelevant but only allowed to try to have Plaintiff collapse and give up, which at the mediation Plaintiff did collapse and give up.. .

76.    Retired Judge Robert Altman was the mediator in 2011.  Instead of being about the facts of both tiers of the case, it was about the personal history of Plaintiff and why the FBI took an interest in the legal situation.  Plaintiff did not collapse like Plaintiff did in 2001 and accept the $80,000 Plaintiff which was being discussed as an offer.  The mediation lasted a very short time, and the mediator was embarrassed to have been called when parties were not ready to settle, and he left in such a hurry that he had to return for his coat.

77.    Plaintiff was under extreme pressure to find a new law firm to substitute in by the hearing set for late June, 2011 where MARH would withdraw. Plaintiff's  lawyers, MARH and LANGER, as well as all previous attorneys including all defense counsel were aware that Plaintiff was frightened to go In Pro Se.

78.    Plaintiff, on information and belief, alleges that Langer and Marh entered  into an agreement with Glickman,  Dykema and B&F counsel to deceive Plaintiff into thinking that the Estate was part of the legal malpractice lawsuit, and that the Dykema and B&F were entitled to document production concerning the Baker Family accounts, that the legal malpractice case was for damages  of both the personal account of Plaintiff and the family accounts.

### Mahavier and Harris involvement

79.    Plaintiff starting interviewing counsel any where in California. ..

Second,  Plaintiff needed to find local counsel if Goldblatt was coming in on the

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

case. Plaintiff found attorney Harris located in San Diego, CA. After a few emails where Plaintiff produced all the documents requested by Harris, Plaintiff drove down and meet with Harris.   At the meeting Harris informed Plaintiff that because of the size of the case, he needed co-counsel and recommended MAHAVIER.

80.     Plaintiff thereafter went to San Diego again and met with MAHAVIER and Harris. Plaintiff made it very clear that what Plaintiff needed was discovery to be done. MAHAVIER could not understand why discovery had not been done. The condition that they made on the case was that they needed a continuance of the trial in order to do discovery until a few months into 2012. By June 22, 2011 Plaintiff and MAHAVIER and Harris had entered into two separate retainer agreements with the condition of a continuance of the trial. When the continuance was granted, the retainer agreement became active which called for each MAHAVIER and Harris to receive non-refundable check for $7500  each and 10% each for any  recovery via a settlement or judgment. Plaintiff sent one check for $7500 to MAHAVIER and one check for $7,500 to Harris in the US mail.

81.     At the withdrawal hearing, both LANGER and MARH were granted their withdrawals and the court graciously granted Plaintiff a continuance. Then in October 2011, at the Motion for Sanctions hearing where MAHAVIER drove up to Los Angeles to be present, the opposition were granted sanctions against Plaintiff personally for $3500 and the court sated on record that the verification form of Plaintiff's signature had not been filed along with the summary of accounts, without which the over 160 pages of accounting detail made little sense. This accounting, which MAHAVIER knew was being done by Jane Baker, under the supervision of Jim Gill who was on vacation or on other pressing engagements. Jane Baker  worked around the clock for 2 months to draft and finalize the accounting.

82.     In October, 2011  MAHAVIER  wanted a securities arbitration specialist to consult with. He mentioned in an email  about the Midwest guy so Plaintiff emailed to see if GOLDBLATT was still available and received an email back(Exhibit 8)  Plaintiff thereupon emailed Aidikoff as a perspective expert. Soon thereafter MAHAVIER and   Harris  consulted Aidikoff  who requested ASAP a decaled summary with documents. Both of these lawyers are experts in their respective fields. Also, MAHAVIER deceived Plaintiff into thinking that the ESTATE was still part of the lawsuit and therefore a significant part of the summary that Aidikoff received was irrelevant. . (Exhibit  3) . Jane Baker would have had only to work on the summary of the Plaintiff's  account for two days instead of 2 weeks

83.     Plaintiff, on information and belief, alleges that Mahavier and Harris entered into agreement with Ameriprise to deceive Plaintiff into believing that their was going to be a deposition of Stanley Cohen and second, that Plaintiff, in the legal malpractice case(BC394851) was entitled to documents pertaining to the Baker Family Accounts.

84.     On December 23, 2011 Plaintiff meet with MAHAVIER and Harris in MAHAVIER's office in San Diego for a status conference. MAHAVIER informed Plaintiff that he would file an objection to the Motion for Judgment on the Pleadings.  We spent 3 hours discussing some possible new parties and new causes of action for an 5th  amended complaint he would file attached to the Objection to Motion for Judgment on the Pleadings. MAHAVIER asked   Jane and Plaintiff to think about it and send us certain documents that we discussed in the 3 hour meeting.. At the meeting, MAHAVIER and Harris promised to serve Stanley R. Cohen, stockbroker a subpoena for a deposition.  The subpoena for deposition went out December 27, 2011. Another promise was to serve a subpoena for the production of documents on Ameriprise.  Harris did serve the Subpoena on Ameriprise.  Over the weekend, we worked around the clock to

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

1
2
send MAHAVIER and Harris documents and summaries on Monday December 26, 2011.

3
4
5
6
7
85.    On January 12, 2012, Plaintiff attended the Judgment on the Pleadings hearing. Plaintiff would learn during the hearing that not only did MAHAVIER never file an Objection as promised, and an amended complaint, he did not show up either by phone or in person. Plaintiff immediately, sent an email asking what happened. Mahavier never replied.

8
### Plaintiff is forced to go In Pro Se

9
10
11
12
13
14
15
16
86.    On January 17, 2012, Harris sent Plaintiff by email a copy of Ameriprise Subpoena Objection which was dated one day after the January 12, 2012 hearing for the Judgment on the Pleadings which had been granted.(Exhibit 9) Plaintiff decided to go In Pro Se to file a Motion for Reconsideration which had to be filed by January 30, 2012. Plaintiff who had never filed a Motion for Reconsideration along with Jane, worked, again, around the clock to meet the January 30, 2012 deadline. Plaintiff used this new information, at least Plaintiff thought it was new, as the basis for CCP 1108(a). It was filed on time.

17
18
19
20
21
22
23
24
25
87.    Thereafter, Plaintiff sought to do discovery in both the legal malpractice case and using the still active probate case. When Plaintiff send out subpoenas on the legal malpractice case, the defendants DYKEMA and B&F counsel opposed stating in emails and a letter that the legal malpractice case was technically dismissed and therefore, no discovery was permissible . Since Plaintiff is not a member of the bar and did not know, Jane Baker had to work again to withdraw all subpoenas served. According to California law only members of the bar can sue on behalf of an estate which is deemed a separate entity, such as a corporation, partnerships, trusts. .

26
27
28
88.    In March 2012, Plaintiff, acting in his capacity as an executor subpoenaed the Estate file of his late mother from MSK who were the firm the represented the Estate of Kate Baker.. The response was an Objection stating

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

among others objections was that Plaintiff did not have standing.  This was curious to say the least, since the Letters of Testamentary that gave Plaintiff his executorship, was drafted and filed by no other than Cutrow as senior partner at MSK.(Exhibit 10 )

89.     Plaintiff sought to do  further discovery using the letters of testamentary and was able to track down the company who had purchased   American Express Business and Tax Records, Inc. After many phone calls, Plaintiff located where the records were and sent a request accompanied by a copy of the letters of testamentary.. The company,   McGladrey CPA's produced an entire box of tax returns dating back to 1995-2005 with back up.  During the forensic accounting in 2005 Gill found several unknown withdrawals with only account numbers but no other identifications.  A cursory review established that one of the withdrawals which was accomplished by forgeries had been wired to Allen Baker's Family Trust. (Exhibit  12)

90.     The review of the documents also produced by McGladrey CPA's contained a copy of 2005 tax return which showed that an account from Bear Stearns still existed until 2005.  The fact was that all monies from Bear Stearns were supposed to be transferred from Bears Stearns to AEFA in early 1996, but this suggests that was apparently not the case.  Plaintiff contacted Mark Gordon, a broker for the former Bear Stearns, now part of JP Morgan, Inc., and asked Plaintiff to fax and he would check into it.  The fax was sent in April 2012 and on July 16, 2012 Plaintiff followed up with Mark Gordon to find out he did nothing when he received the fax.  Gordon recently contacted Plaintiff and said he was still doing research. (Exhibit 11)

91.     During March 2012 Plaintiff served several probate subpoenas on various people and entities for production of documents and for depositions. Allen Baker and Frank Baker in their capacities as executors filed various objections

with the court and with the then opposition defendants and AMERIIPRISE counsel.

92.     At the hearing of March 22, 2012, the court denied Plaintiff's motion for Reconsideration. During the short hearing, defendants again claimed that the NASD ruled that Plaintiff had no standing and the court stated it did not want to relitigate the matter.

93.     Hearing the deceitful arguments made by the defendants' Dykema and B&F, Baker filed a renewal of the motion for Reconsideration as allowed by CCP § 1008(b) in the accordance with the provision.

## New Evidence pertaining to the Baker Family Accounts

94.     With the new evidence pertaining to Allen Baker acts between approximately 1996 with the assistance of lawyers,AEFA/Ameriprise and COHEN, Plaintiff used the CCP 1008(B) to obtain a reversal of the previous motion This time, Plaintiff was indeed stunned to find that that LANGER who had added the ESTATE to the 4th amended complaint and informed Plaintiff that only FAIRSHTER had been stricken but deceiffuly left out that the ESTATE had also been stricken. Furthermore, when MAHAVIER and Harris sought discovery for documents and deposition concernng the BFT and BFP, is was to deceive {Plaintiff. Baker also wanted to have the court put back on calendar the Motion to Overrule Objections and Compel the Production of documents that had been filed by Baker. Baker and Jane Baker worked around the clock to put together the motion after having never done this type of motion before. According to the Ameriprise subpoena objection they had produced documents to the "plaintiff in a prior probate proceeding". Judge Susan Bryant-Deason strongly implied that it was possible that the documents were produced as far back as 2001.

## In Pro Se Clients are discriminated against

95.     During March, 2012 Plaintiff learned that .there is a rule in the Business and Professions Code that forbids attorneys, paralegals, disbarred lawyers, and

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

companies, such as LA Reports who provide services to take depositions, etc, to assist In Pro Se clients.(Exhibit 13) .In all prior motions where Plaintiff was In Pro Se  Baker's wife Jane did  extensive editing of the legal filings because of Baker's developmental disorder and learning disabilities. For this Complaint the Plaintiff is doing the work himself.

## V.   Claims for Relief:

### First Claim for Relief

(Against defendants AEFA, Ameriprise, State Bar of California only)

(Unreasonable Restraint of Trade)

(Sherman Act, 25 US C § 1)

96.    Plaintiffs refer to paragraphs 36 through 95, above and by such reference incorporate same herein as if set forth in full.

97.    AEFA, Amerprise have unreasonably restrained competition by and through the control of their agents to insist that their agents, by the use of incentives and other pressure techniques to sell there in-house products which have consistently underperformed to their clients, the Plaintiffs in the instant case.

98.    The State Bar of California have unreasonably restrained competition by and through the complete control and monopoly of access to the state court systems and  which can be had only through the use of its members.  In addition, only its members have access to private companies which are mandatory to engage in the discovery process.  Also, to engage attorneys for "appearances", the companies that provide such services are limited solely to    members of the bar.

99.    The original purpose of the Bar was to provide for the safety and welfare of its residents of access to the court systems to maintain the dignity  and a certain level of expertise which is necessary to practice law.

100.   Because of the unreasonable restraint of competition, Plaintiff was forced to spend hundreds of thousands of dollars only to be deceived from each attorney or law firm retained as detailed in the factual allegations.

101.   These actions of Ameriprise, AEFA, and the State Bar of California. Constitute unreasonable restraint of trade and commerce and therefore violate § 1 of the Sherman Antitrust Act.  15 U.S.C.  § 1.)

## Second Claim for Relief:

(Against Defendants AEFA, AMERIPRISE,  COHEN)

(The Investment Advisers Act of 1940)

(15 USC §§ 80(b) 1-1 through b-21)

102.   Plaintiffs refer to paragraphs 36 through 95, above and by such reference incorporate same herein as if set forth in full.

103.   Defendants, and each of them,  actions as described in paragraph 97 above,  that were deceptive, manipulative and  misleading with respect to the securities that were sold to Plaintiffs were  in  violations of 15 USC §§ 80b-1 through 6-21.

## Third Claim for Relief

(Against Defendants AEFA, AMERIPRISE, COHEN)

((The Securities Investor Protection Act of 1970)

(15 USC §§ 78aaa through 78111))

104.   Plaintiffs refer to paragraphs 36 through 95, above and by such reference incorporate same herein as if set forth in full.

105.   Defendants., and each of them, actions  as described in paragraph 110 above, that were deceptive, manipulative  and misleading with respect to the securities that were sold to Plaintiffs were in violations of 15 USC §§ 78aaa through 78111.

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>Fourth Claim for Relief:</u>

(Against all defendants)

R.I.C.O.

((18 U.S.C. § 1961 et seq.)

106.   Plaintiffs refer to paragraphs 36 through 95, above and by such reference incorporate same herein as if set forth in full.

107.   At all material times herein, AEFA, AMEX, and Ameriprise, FAIRSHTER, BENNETT, DONAHUE, CHIA, DYKEMA,  PHAN, GLICKMAN, GLICKMAN & GLICKMAN, R&P,  AETBS,  where associated with enterprises engaged  in activities  which affected interstate commerce. Those enterprises consisted of all defendants.  These enterprises had on going organizations with a framework for making decisions, functioned as continuing units and had ascertainable structures and systems of authority guiding their operations, separate and apart from the pattern of racketeering in which each enterprise  engaged herein outlined.

108.   The Defendants and each of the other aforesaid persons or entities who were part of the aforesaid enterprises conspired to conduct and participate in the conduct of the affairs of the aforesaid enterprises, and they conducted and participated , directly and indirectly in the conduct and affairs of the said enterprises  though a  pattern of  racketeering  activity.

109.   Defendant STATEBAR entered into an agreement with DYKEMA who represented American Express not to investigate FAIRSHTER competently to make sure FAIRSJTER would  be found not guilty of criminal acts that a federal court found FAIRSHTER found him guilty of.

110.   Defendant Glickman entered into an agreement with Phan and R&P who had  previously consulted and advised AEFA, American Express, counsel both

Dykema and Eagerton & Weaver and therefore, was part of the concerted enterprise to cause Plaintiffs serious financial loss.

111.   Defendant Stern entered into agreement with Glickman who previously had entered into agreement with Phan and R&P who had AEFA, American Express, counsel Dykema and Eagerton & Weaver, was part of the concerted enterprise to cause Plaintiffs serious financial loss.

112.   Defendants Marh and Langer entered into agreement with Glickman & Stern who previously had entered into agreement with AEFA, American Express, and their counsel Dykema , Eagerton & Weaver, was part of the concerted enterprise to cause Plaintiffs serious financial loss.

113.   Defendant Mahavier and Harris entered into agreement with Langer and Glickman who had previously had entered into agreement with Phan and R&P who had  previously consulted and advised AEFA, American Express, counsel both Dykema and Eagerton & Weaver and therefore, was part of the concerted enterprise to cause Plaintiffs serious financial loss.

114.   The pattern of racketeering activity consisted of repeated acts of mail and wire fraud,  threatening of witnesses, which constitute an essential part  of or were incidental  to an essential element  of the aforesaid schemes and artifices  to defraud Plaintiffs, for which unlawful acts and conduct of attempted extortion and extortion, payoffs and bribery were directly  in the administration and enforcement of the racketeering activity and predicate acts in furtherance of the aforesaid enterprise, in which all of the Defendants  participated.

115.   All Defendants law firms violated the BADACPA by taking monies from Plaintiffs in the form of legal fees and by falling to clearly disclose the inter-relationships between said law firms(i.e. that Comanor, who recommended Bennett to Plaintiff as a lawyer; had acted as an expert witness for brokerage firms, including AMEX and that Donahue had worked with one of the lead lawyers for AEFA, AMERIPRISE and COHEN of the SEC in  Los Angeles).

116.   B&F, Dykema & R&P also failed to disclose  the conflicts of interest between  the DYKEMA  firm on the one part and AEFA, AMEX, and, on the other part until after the NASD removed  Plaintiffs  claims against AEFA, AMERIPRISE and COHEN  to the Superior Court and only disclosed  said conflict on the eve of the Superior Court hearing to reopen  Plaintiff's Superior Court Case  causing additional delay in Plaintiff's right to speedy determination of his grievances. In May 2011, Plaintiff learned that defendants B&F, DAVIS, R&P, DYKEMA CHIA, BENNETT, FAIRSHTER, DONAHUE, PHAN,   knew at the time of the NASD ruling that  it was part of the scheme/plan to deceive Plaintiff that he had to reopen the former Superior Court Case otherwise Plaintiff would not have been barred by the Statute of Limitations.

117.   Defendants AEFA, AMERIPRISE, and COHEN knew or should have known that the statements made to PLAINITFFS" regarding control of PLAINITFF'S accounts were false and/or misleading and said defendants , and each of them, concealed such information from Plaintiffs.

118.   Defendants law firms knew or should have known that the failure on their parts to disclose the inter-relationships of the law firms and/or the conflicts of interests  were false and/or misleading and said defendants, and each of them, concealed such information  from Plaintiffs with intent to deceive  and mislead Plaintiffs.

119.   .The pattern of racketeering activity directly and proximately damaged Plaintiffs, who suffered financial loss as a result of the fraudulent activities of the Defendants, and each of them

120.   Such pattern of racketeering activity constituted mail fraud violations of 18 U.SC. § 1341, wire fraud violations 18 USC §  1343.,  conspiracy to obstruct justice 18 USC § 1962(d), financial institution fraud 18 USC § 1344 tampering with a witness 18 USC § 1512, obstruction of justice 18 USC § 1503,  interference with commerce, robbery or extortion 18 USC  § 1952. and involved dissemination

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

through the mail and by telephone and facsimile, of false and fraudulent pretenses, representations and promises, in order to obtain money from Plaintiffs for trade and/or transaction fees and legal fees incident to the essential parts of the aforesaid schemes and artifices to defraud.

121.  The false representations and promises and the dissemination through the mail and by telephone included, but were not limited to: (a) the use of the mail to disseminate information promoting financial investment and investment products being offered by AEFA and AMERIPRISE; (B) the use of the telephone and facsimile to disseminate information promoting financial investment products being offered by AEFA and AMERIPRISE; (c) the use of the mail, telephone and facsimile to obtain Plaintiffs authorization to make certain investments trades and agree to various fee arrangements; (d) the use of the mail, telephone and facsimile to arrange and carry out the administration of the investment trades and various fee arrangements made on behalf of Plaintiffs; (e) the use of mail, telephone and facsimile to obtain Plaintiffs signature on various documents that consented to and/or acknowledged the investments trades and agreed to various fee arrangements wit v various Defendants; (f) the use of the mail, telephone and facsimile to issue notices, demand, billings and collection information for information for investments with AEFA and AMERIPRISE; (g) the use of the mail, telephone, and facsimile by AEFA. AMEX, AMERIPRISE, to deprive Plaintiff of monies rightfully due to him pursuant to 2002 Settlement Agreement;(h) ;the use of the mail, telephone and facsimile by AEFA, Ameriprise DAVIS, B&F, DYKEMA, R&P, FAIRSHTER, GLICKMAN, GLICKMAN & GLICKMAN, BENNETT, PHAN, CHIA, DONAHUE to thwart Plaintiffs from having a full hearing on the merits of his case against AEFA, AMERIPRISE, and COHEN before the NASD; (i) the use of the mail, telephone , and facsimile by AEFA, AMEX, AMERIPRISE,,  to deprive Plaintiff of entering into a fair and reasonable 2002 Settlement Agreement. (j) the use of the mail, telephone and

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

facsimile AEFA, and AMERIPRISE to conceal documents relevant to Plaintiffs claims to the NASD proceeding and conspiring with, PHAN, DONAHUE, CHIA, FAIRSHTER, BENNETT , R&P, B&F, GLICKMAN, GLICKMAN & GLICKMAN, and the DYKEMA firm to destroy said documents; (k) the use of the mail, telephone, and facsimile by AEFA, AMERIPRISE, COHEN, B&F, DYKEMA, DAVIS, R&P, GLICKMAN & GLICKMAN, DONAHUE, FAIRHSTER, BENNETT, MAHAVIER and GL;ICKMAN to delay Plaintiffs' claims against AEFA, AMERIPRISE, COHEN, being heard by any competent court or forum prior to AEFA spinning off AMERIPRISE as a separate subsidiary ; and (l) the use of the mail, telephone, and facsimile to issue notices, demands, billings and collection information for legal billings and dissemination of false information from B&F, DYKEMA and R&P firm.  The specific acts of the various Defendants which are incident to the essential parts of the aforesaid schemes and artifices are set forth in Paragraphs 36 through 95 above.

122.   The predicate acts, set forth above, by Defendants, and each of them, against Plaintiffs occurred after the enactment of the Racketeer Influence Corrupt Organization Act, 18 USC §1961, et seq,.

123.   Each of the acts of Defendants , and each of them, as described herein was conducted for the purposes of furthering the Defendants' scheme to promote and to continue the false and fraudulent pretenses, statements and promises, and to thereby defraud Plaintiffs and to gain and profit at Plaintiffs' expense by interfering with Plaintiffs' right to obtain a full hearing on the merits of his allegations against, AEFA, AMERPRISE, and COHEN.

124.   Each of these said acts of the Defendants, and each of them, regarding the Plaintiffs had similar purpose, involved the same or similarly situated acts thus constituted a pattern of racketeering activity with the meaning of the Racketeer Influence Corrupt Organizations Act, 18 USC §1961 et seq.

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

125.   As a direct and proximate cause of the activities of Defendants, and each of them, which were violative of the Racketeer Influence Corrupt Organizations Act.  Plaintiffs suffered substantial loss and damages of there properties.  The loss entitles Plaintiffs to recover treble damages against Defendants, and each of them, and costs of suit, including reasonable attorney's fees, pursuant to 18 USC § 1961

<u>Fifth Claim for Relief</u>

(Against all Defendants)

Due Process

(5th amendment & 14th Amendment)

126.   Plaintiffs refer to paragraphs 36 through 95, above and by such reference incorporate same herein as set forth in full.

127.   Plaintiffs were denied due process by the Defendants, and each of them, as guaranteed in the Americans with Disabilities Act(ADA) as factually asserted in paragraph 126.

128.   Plaintiffs were denied due process and equal protection of the laws when GLICKMAN, R&P,  PHAN compelled Plaintiff to go In Pro Se in the Probate Case knowing that Plaintiff would not be able to represent the Estate nor do discovery as to be in violation of the law.

129.   Plaintiffs due process rights were violated when Defendants DYKEMA, B&F,  R&P,GLICKMAN, PHAN, DONAHUE, CHIA, FAIRSHTER, BENNETT, AEFA and AMEX did not re-file Plaintiffs claim against AEFA and COHEN in either State Superior Court or Federal Court pursuant to NASD Code § 10305.

130.   Plaintiffs were denied due process by the Defendants, and each of them, in the original 2002 Settlement Agreement as a Probate Court Order for reasons detailed in paragraph 126.

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

131.   Plaintiffs were denied due process by the Defendants, and each of them, as guaranteed in the equal protection clause of the 14th amendment of the US. Constitution.

132.   Plaintiffs were denied due process by the Defendants, and each of them, when Plaintiff did not have a full trial in the Superior Court in 2002 as detailed in paragraph 126.

133.   Plaintiffs were denied due process by the Defendants, and each of them, when Plaintiffs did not get a hearing on the merits of the case in the NASD as detailed in paragraph 126.

134.   Plaintiffs were denied due process by the Defendants, and each of them, in the Superior court hearings in 2006 as detailed in paragraph 126.

135.   Plaintiffs were denied due process by the Defendants, and each of them, when the appeal was filed in 2007 after the Superior Court case number LC.

136.   Plaintiffs were denied due process by the Defendants, and each of them, in the Federal Court case #CV-09-3179GHK.

137.   Plaintiffs were denied due process by the Defendants, and each of them, when Plaintiffs were denied access to the use of members of the bar, paralegals, attorneys services, and court reporters services i.e. LA Reporters.

138.   Plaintiffs were denied due process by Defendant STATEBAR when Plaintiff filed attorney complaint against Matthew FAIRSTHER and Joel BENNETT and it was inappropriately handed by principal investigator Michael O Chavez to such an extent that FBI special agent knew that the complaint would result in a letter stating that Chavez found that FAIRSHTER and BENNETT had committed no violations of ethics or criminal conduct.

139.   Plaintiffs were denied due process by the Defendants, and each of them, in the Ameriprise State Case BC435030, where Plaintiffs did not get a fair hearing and were demurred out.

140.   Plaintiffs were denied due process by the Defendants, and each of them, in the legal malpractice case BC394851 in that Plaintiff was advised that the case was for seeking damages for both the Plaintiffs personal account at AEFA and the Baker Family accounts at AEFA and on May 30, 2012, Plaintiff learned that the case was solely about Plaintiffs personal account.

141.   Plaintiffs were denied due process by the Defendants, and each of them, in the legal malpractice case BC408161 since Plaintiff never received a trial on the merits due to the unethical and false statements by STERN when he withdraw as counsel.

142.   Plaintiffs were denied due process by the Defendants, and each of them, when they committed violations of Obstruction of Justice Act as detailed in that cause of action.

143.   Plaintiffs were denied due process by the Defendants, and each of them, when they committed violations of the Conspiracy to commit Obstruction of Just as detailed in that cause of action.

144.   Plaintiff is denied due process by the Defendants, and each of them, in compelling  this  Plaintiff to pay the filing fee of $350 to file this complaint  in the hope of obtaining due process of the 14th amendment of the US. Constitution.

145.   Plaintiff is denied is due process rights by the Defendants, and each of them, in compelling the Plaintiff to spend countless hours in preparing this complaint in the hope of obtaining due process of the 14th amendment of the US. Constitution.

### Sixth Claim for Relief

(Against all Defendants)

(Elder Abuse and Dependent Adult Protection Act)

(California Welfare & Institutions Code § 15600 et seq.)

(

146.   Plaintiffs refer to Paragraphs 36 through 95, above and by such reference incorporate same herein as set forth in full.

147.   All times relevant to this action occurring prior to 2019, Plaintiff was a dependant adult as defined under the Elder Abuse and Dependant Adult Civil Protection Act (hereinafter "EADACPA") and specifically under California Welfare & Institutions Code § 15600.23(a) who suffered from various limitations that restricted his ability to carry out normal activities or to adequately protect his rights.

148.   At all times relevant to this action, Plaintiff & Kate Baker, and ESTATE was an elder adult as defined under EADACPA.

149.   At all times relevant to this action, Defendants AEFA, AMEX, AMERIPRISE, COHEN, AETBS, DAVIS, R&P, DYKEMA, B&F, GLICKMAN & GLICKMAN, GLICKMAN, STERN, MARH, LANGER, MAHAVIER, stood in a position of trust to Plaintiffs in that said Defendants , and each of them, created the fiduciary relationship of a financial and/or legal advisor

150.   The taking, secreting, and misappropriation by Defendants, and each of them, of Plaintiffs' assets and money, were unlawful. The actions or failures of Defendants, and each of them, as alleged herein, are an unconscionable and despicable fraud upon Plaintiffs. Plaintiffs were misinformed or were not informed of various stock transactions performed by AEFA, AMERIPRISE AND COHEN, which caused PLAINTIFFS' excessive trading fees. Representations made by AEFA, AMERIPRISE, and COHEN that Plaintiffs were in control of investment accounts in Plaintiffs' name or for Plaintiffs' benefit (collectively "Plaintiffs' Account") were in fact false.

151.   All Defendants law firms violated the EADACPA by taking monies from Plaintiffs in the form of legal fees and by falling to clearly disclose the inter-relationships between said law firms(i.e. that Comanor, who recommended

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

Bennett to Plaintiff as a lawyer; had acted as an expert witness for brokerage firms, including AMEX and that Donahue had worked with one of the lead lawyers for AEFA, AMERIPRISE and COHEN of the SEC in Los Angeles).

152.   B&F, Dykema, and R&P also failed to disclose the conflicts of interest between the DYKEMA firm on the one part and AEFA/Ameriprise and AMEX, on the other part, until after the NASD removed Plaintiff's claims against AEFA, AMERIPRISE and COHEN to the Superior Court and only disclosed said conflict on the eve of the Superior Court hearing to reopen Plaintiff's Superior Court Case causing additional delay in Plaintiff's right to speedy determination of his grievances. In May 2011, Plaintiff learned that defendants B&F, DAVIS, R&P, DYKEMA CHIA, BENNETT, FAIRSHTER, DONAHUE, PHAN, knew at the time of the NASD ruling that it was part of the scheme/plan to deceive Plaintiff that he had to reopen the former Superior Court Case, otherwise Plaintiff would not have been barred by the Statute of Limitations.

153.   Defendants AEFA, AMERIPRISE, and COHEN knew or should have known that the statements made to PLAINITFFS regarding control of PLAINITFF'S accounts were false and/or misleading and said defendants, and each of them, concealed such information from Plaintiffs.

154.   Defendant law firms knew or should have known that the failure on their parts to disclose the inter-relationships of the law firms and/or the conflicts of interests were false and/or misleading and said defendants, and each of them, concealed such information from Plaintiffs with intent to deceive and mislead Plaintiffs.

155.   The conduct of Defendants, and each of then, as described and alleged herein, constituted fiduciary abuse as defined in California Welfare & Business Code   § 15610 (f).

156.   Defendants, and each of them, are guilty of recklessness, oppression, fraud and malice in the commission of the financial abuse of Plaintiffs described and alleged in this Complaint.

157.   Under California Welfare and Institutions Code § 15657 (a) , Defendants , and each of them, are liable for reasonable attorneys fees and costs and for treble damages pursuant to California Civil Code § 3345.

Seventh Claim of Relief

(Against all Defendants)

(Obstruction of Due Administration of Justice)

(18 USC § 1503)

158.   Plaintiffs refer to paragraph 36 through 95, above and by such reference incorporate same herein as if set forth in full..

159.   Defendants DAVIS, AEFA, and AEFA's counsel through their actions in orchestrating the filing of a lawsuit filed in the Superior Court in 2002, and specifically not pursuing damages on behalf of the ESTATE, sought to influence, obstruct and /or impede the due administration of justice. Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities cause of action since they involved the use of instruments of interstate commerce.

160.   Defendants DAVIS, AEFA sought to influence, obstruct and/or impede the due administration of justice when DAVIS deliberately asked to court to stay the case upon completion of the NASD arbitration case primarily, DAVIS said to use the discovery process of the Superior Court. DAVIS stated to the court that NASD discovery process was   impotent. It was impotent because DAVIS intentionally and to deceive Plaintiff, the superior court(LC060762) and the NASD arbitration panel did not name the ESTATE in either court and/or NASD. Obstruction of justice in civil cases falls within the purview of the RICO cause of

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

action, and American with Disabilities cause of action  since they involved the use of instruments of interstate commerce.

161.   Defendants DAVIS, AEFA, and AEFA' counsel, DYKEMA, R&P, FAIRSHTER, BENNETT,  DONAHUE, PHAN, CHIA, knew that the clarification issue being used by Plaintiff was false, misleading and deceptive and was the proximate cause of the dismissal of the Federal Lawsuit(CV-09-3179GHK) and  sought to influence, obstruct and/or impede the due administration of justice.  Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and the American with Disabilities cause of action since they involved the use of instruments of interstate commerce.

162.   Defendants DAVIS, AEFA, and AEFA's counsel through the orchestrating DAVIS to voluntary dismissal of the Superior Court Case DAVIS filed in 2002, dismissing it in January, 2003, sought to influence, obstruct and /or impede the due administration of justice.  Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce

163.   Defendants DAVIS, AEFA, and AEFA's, DONAHUE, PHAN, FAIRSHTER, BENNETT, CHIA, through the orchestrating DAVIS not to include the ESTATE as part of the NASD arbitration complaint sought to influence, obstruct and /or impede the due administration of justice. Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.  Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce

164.   Defendants FAIRHSTER, BENNETT ,CHIA, B&F, DYKEMA in not intentionally filing a malpractice action against DAVIS sought to influence, obstruct and /or impede the due administration of justice. Obstruction of justice in

civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

165.   Defendants DAVIS, AEFA, AEFA's counsel, B&F, DYKEMA, CHIA, FAIRSHTER, BENNETT and R&P received documents irrelevant to the personal account of RBT account to deceive Plaintiff into thinking that the NASD arbitration was on behalf of both Plaintiff, an individual and on behalf of the ESTATE, seeking to influence, obstruct and /or impede the due administration of justice. Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

166.   Defendants AEFA/AMERIPRISE, AMERIPRSE counsel, CHIA, BENNETT, FAIRHSTER, B&F, and DYKEMA filed motions for ESTATE documents  and then filed Motions to Compel the Production of those documents to effectively deceive Plaintiff into believing that the NASD arbitration was a complaint  for both Plaintiff as an individual and on behalf of the ESTATE, seeking to influence, obstruct and /or impede the due administration of justice. Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

167.   AEFA/AMERIPRISE's counsel and Defendants AEFA, AMERIPRISE, DAVIS, B&F, R&P, CHIA, B&F, and DYKEMA, in manipulating, conspiring and deceiving the NASD arbitration panel to rule that the NASD case be sent back to the Superior Court and never informing the NASD panel that the original Superior Court Case had been dismissed, sought to influence, obstruct and /or impede the due administration of justice. Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities

Cause of Action since they involved the use of instruments of interstate commerce.

168.   AEFA/AMERIPRISE's counsel and Defendants AEFA, AMERIPRISE, B&F, DYKEMA, GLICKMAN, BENNETT, FAIRSHTER, CHIA, DONAHUE, GLICKMAN & GLICKMAN and R&P manipulated, conspired and deceived Plaintiff that the NASD ruling's effect required that the original Superior Court Case be reopened due to statute of limitations constraints, when in fact, the ruling tolled the statute of limitations, allowing filing of a new lawsuit in Superior or Federal Court. These acts sought to influence, obstruct and /or impede the due administration of justice. Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

169.   Defendants, and each of them, sought to influence, obstruct and /or impede the due administration of justice when the case against AEFA/Ameriprise and Stanley Cohen was deliberately dismissed out of the Superior Court (Case LC060762) and was affirmed on Appeal. Plaintiff lost ability to recover punitive damages in the underlying case. Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

170.   Defendant STERN sought to influence, obstruct and/or impede the due administration of justice when he unethically withdrew as counsel for Plaintiff in Hahn case(BC435030) and did not pursue the discovery of documents from Hahn that they made have received according to the Ameriprise Objection of January, 2012. Because of the settlement agreement with Hahn, Plaintiff is precluded from naming Hahn in a future lawsuit such as this current one. Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

171. Defendants, and each of them, sought to influence, obstruct and/or impede the due administration of justice when STERN intentionally did not draft the 3rd amended complaint properly to include elder abuse damages so that LANGER withdrew the elder abuse damage cause of action from the 4th amended complaint, superior court case(BC394851). Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

172. Defendants STERN, LANGER and AEFA/AMERIPRISE sought to influence, obstruct and/or impede the due administration of justice when they did not name the ESTATE as a Plaintiff in the Ameriprise State Case (BC435030). Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

173. Defendants B&F, DYKEMA, R&P, AEFA/AMERIPRISE, BENNETT, CHIA and FAIRSHTER, deliberately filed wrong and inappropriate motions to get back on Calendar in the original Superiors Court Case to make sure their was no chance what so ever to get back on Calendar. These acts sought to influence, obstruct and /or impede the due administration of justice. Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

174. Defendants AEFA/AMERIPRISE through their counsel, filed prejurious affidavits stating that the NASD pre-hearing telephonic conference was an evidentiary hearing of the case on the merits, when she knew that the telephonic conference was in fact a discussion of discovery motions and not an evidentiary hearing, and when she knew what the ruling legally meant. These acts sought to influence, obstruct and /or impede the due administration of justice Obstruction of

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

175.  Defendants AEFA/AMERIPRISE, B&F, DYKEMA,R&P,, BENNETT, CHIA, FAIRHSTER,  DONAHUE, PHAN after having filing wrong motions intentionally and maliciously attempted to get Plaintiff to settle for a very small amount of money, sought to influence, obstruct and /or impede the due administration of justice Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

176.  Defendants AEFA/AMERPRISE, B&F, DYKEMA, R&P,  CHIA, BENNETT, FAIRSHTER  DONAHUE, GLICKMAN,  GLICKMAN & GLICKMAN and maliciously, demanded Plaintiff file an appeal when  they purposely got the Superior Court Case dismissed.  The appeal cost $20,000. These acts sought to influence, obstruct and /or impede the due administration of justice Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

177.  Defendant GLICKMAN, BENNETT, CHIA, FAIRHSTER, DONAHUE, PHAN, deliberately withheld the fact that the Appeal was only about the RBT Account and that the NASD ruling demanded that the complaint be refiled in the Superior Court and/or Federal Court with no issue of stature of limitations. These acts sought to influence, obstruct and /or impede the due administration of justice Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

178.  Defendants GLICKMAN sent Plaintiff an email and letters insisting that he would not file on Plaintiff's behalf a legal malpractice lawsuit until Plaintiff

sent him $5000 for an expert. Plaintiff did send GLICKMAN $5000 for the expert having to settle with Allen and Frank Baker and lose hundreds of thousands of dollars in a settlement agreement regarding the Trust account at CNB. GLICKMAN knew he was never going to use the expert. These acts sought to influence, obstruct and /or impede the due administration of justice Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

179.   Defendants STERN, AEFA/AMERISE for conspiracy with each other that STERN would enter into a retainer agreement for the filing of a federal lawsuit(CV09-3179 GHK) with the intention of obtaining $7500. by false pretenses and STERN specifically knew that STERN will manipulate and have the case dismissed. These acts sought to influence, obstruct and /or impede the due administration of justice. Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

180.   Defendant STERN entered into a retainer agreement for the filing of a state Superior Court lawsuit (BC435030) with as a further extension of the dismissed Federal Lawsuit and obtained $5000 by false pretenses. STERN specifically knew he would manipulate and have the case dismissed. These acts sought to influence, obstruct and /or impede the due administration of justice Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

181.   Defendant STERN, entered into a retainer agreement to file a lawsuit on behalf of Plaintiff against Hahn for legal malpractice. Plaintiff paid STERN $31,000, and had to settle for $20,000, because STERN, using false statements, sought to influence, obstruct and /or impede the due administration of justice

Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

182.   Defendant STERN, having deposed Byam and discovered material false statements by Byam, committed perjury himself to withdraw from the case three weeks prior to trial.  Plaintiff had to sign a Settlement Agreement for only $20,000 in the successful attempt by STERN, to cover up unlawful and tortuous acts by Byam, Cutrow, Allen Baker, and Frank Baker.  These acts by STERN sought to influence, obstruct and /or impede the due administration of justice. Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

183.   Defendant STERN meet with Elder Abuse attorney/expert Steward Levin to retain his services but intentionally lied about material facts of the case, in that, attorney Levin declined representation. Such an by STERN sought to influence, obstruct and /or impede the due administration of justice. Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

184.   Defendant GLICKMAN refused to serve a subpoena and add on AEFA/AMERIPRISE as well as adding on the ESTATE as a Plaintiff after Plaintiff received a letter from Ameriprise in August, 2008 which indicated fraud on the part of AEFA/AMERIPRISE.  This refusal by GLICKMAN sought to influence, obstruct and /or impede the due administration of justice. Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

185.   Defendant GLICKMAN intentionally filed a defective complaint and sequent defective amendments to the complaint resulting in its being demurred out. This act by GLICKMAN is evidence that GLICKMAN sought to influence, obstruct and /or impede the due administration of justice. Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

186.   When GLICKMAN did not inform Plaintiff of the significance of the NASD ruling when he learned of it in September, 2006, GLICKMAN sought to influence  obstruct and/or impede the due administration of justice. Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

187.   When Defendants GLICKMAN, , B&F, DYKEMA, FAIRSHTER, BENNETT, CHIA, DONAHUE,  caused the legal malpractice suit to be appealed was a further evidence that they sought to influence, obstruct and /or impede the due administration of justice Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

188.   Defendants B&F, DYKEMA BENNETT, FAIRSHTER  petitioned the Appellate court to dismiss the Appeal on the ground that Plaintiff was barred by the Stature of Limitations,  in the opposition papers filed the tolling agreements the B&F and DYKEMA had signed. This action sought to influence, obstruct and /or impede the due administration of justice Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

189.   Defendant GLICKMAN refused to file an amended complaint after Plaintiff won the appeal which GLICKMAN had asked the court for.  This is further evidence that GLICKMAN sought to influence, obstruct and /or impede the due administration of justice Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

190.   Defendant AEFA/AMERIPRISE counsel called forensic accountant Jim Gill and threatened him to discuss the case or else.  This call is evidence that AEFA/AMERIPRISE sought to influence, obstruct and /or impede the due administration of justice. Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

191.   Defendant MARH, LANGER attempted to extort monies from Plaintiff to get Plaintiff to terminate there written agreement. Such an act that sought to influence, obstruct and /or impede the due administration of justice Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

192.   Defendant LANGER, MARH  produced document to opposition that opposition were not entitled to and by which the court would eventually sanctioned Plaintiff for being incomplete. Such act sought to influence, obstruct and /or impede the due administration of justice. Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

193.   Defendant LANGER filed a 4th amended complaint added the ESTATE on as a named plaintiff and naming FAIRSHTER as a named Defendant.  Such acts were legally barred by the statute of limitations but had the effect of

maliciously deceiving Plaintiff by emailing Plaintiff that opposition only moved to strike FAIRSHTER from the 4th amended complaint.  Plaintiff reasonably thought until May 30, 2012 that the legal malpractice lawsuit sought damages on behalf both the Plaintiff personal account and the ESTATE.  These acts sought to influence, obstruct and /or impede the due administration of justice Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

194.   Defendant LANGER, MARH filed Case Management Form which deceived the court thinking that most discovery had been done and therefore a mediation would be appropriate and was ordered.  This is further evidence that Defendant LANGER sought to influence, obstruct and /or impede the due administration of justice Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

195.   Defendants LANGER and MARH caused to be served a subpoena for the Production of documents on AEFA/AMERIPRISE.  At the May 30, 2012 hearing, Plaintiff learned that the documents for the ESTATE would be irrelevant in the legal malpractice lawsuit.  This is another piece of evidence that LANGER and MARH sought to deceive Plaintiff into thinking that the legal malpractice law suit was on behalf of the ESTATE as well as the RBT.  These acts are further evidence that they sought to influence, obstruct and /or impede the due administration of justice Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

196.   Defendants LANGER and MARH filed with the mediator retired Judge Robert Altman a copy of the 4th amended complaint which showed that the ESTATE was part of the lawsuit.  This was deceptive to the mediation process in

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

that B&F and DYKEMA knew of the deception. Such is further evidence that they sought to influence, obstruct and /or impede the due administration of justice Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

197.   Defendant MAHAVIER and attorney Harris would take on case BC394851 if the court granted a continuance of trial for approximately 8 months to do proper discovery. In June, 2011, the court did grant a continuance against its wishes. MAHAVIER and Harris never planned to do any discovery. By this act they sought to influence, obstruct and /or impede the due administration of justice Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

198.   Defendant MAHAVIER never did the discovery that he promised, informing Plaintiff at a December 23, 2012 meeting in San Diego, CA that things did not pan out. Such non action sought to influence, obstruct and /or impede the due administration of justice Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

199.   Defendant MAHAVIER, on December 23, 2012, promised to file an objection to the Motion for Judgment on the Pleadings with a Motion to amend the current active complaint. MAHAVIER did not file the opposition nor did he show up to represent Plaintiff on January 12, 2012, although MAHAVIER informed the court he would be present by court phone. This set of acts and non-acts sought to influence, obstruct and /or impede the due administration of justice Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

200.   Defendant AMERIPRISE through their counsel filed an Objection on January 15, 2012 with Harris, stating that Plaintiff had no standing to receive documents, and that AMERIPRISE had produced to the Plaintiff such documents "in a prior probate proceeding". The subpoena was aimed to deceive Plaintiff into believing that the legal malpractice lawsuit was indeed on behalf of the ESTATE. This objection sought to influence, obstruct and /or impede the due administration of justice. Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

201.   Defendants B&F,DYKEMA  BENNETT, FAIRSHTER, CHIA, DONAHUE, deceived the  Superior Court (LC 060762) and the NASD that Plaintiff did not have standing to sue on behalf of the ESTATE, until Plaintiff asked for judicial notice of the Probate Adjudication of the Letters of Testamentary which was granted and acknowledged by B&F and DYKEMA's counsel on May 30, 2012. These acts and non acts sought to influence, obstruct and /or impede the due administration of justice Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

202.   .Defendants law firms knowing that state law requirement only a member of the bar could sue on behalf of the ESTATE, sought to influence, obstruct and /or impede the due administration of justice by deliberately, causing Plaintiff to go in Pro Se in Probate proceedings and one legal malpractice case(BC394851) knowing he would be committing the unauthorized practicing of law. Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

203.   Defendant STATEBAR through their principal investigator Michael O. Chavez sought to influence, obstruct and /or impede the due administration of justice by deliberately covering up evidence which Plaintiff gave him verbally, in writing and legal documents proving that B&F committed unethical and criminal acts in their representation of Plaintiff causing of Office of Chief Counsel to render an opinion that B&F and each of them had committed no unethical and/or criminal acts. Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

204.   Defendants, and each of them, by causing Plaintiff to have to go In Pro Se in legal malpractice case(BC394851 to find out that such legal malpractice lawsuit was solely about the RBT account. sought to influence, obstruct and /or impede the due administration of justice Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

205.   Defendants, and each of them, by causing Plaintiff, who had suffered from a developmental disorder causing learning disabilities to have to draft the present lawsuit, sought to influence, obstruct and /or impede the due administration of justice. Obstruction of justice in civil cases falls within the purview of the RICO cause of action, and American with Disabilities Cause of Action since they involved the use of instruments of interstate commerce.

206.   Said actions of defendants constituted an obstruction of justice and were a violation of 18 USC § 1503.

## Eighth Claim for Relief

(Against all Defendants)

(Conspiracy to Obstruct Justice 42 USC § 1985)

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

(Conspire to Interfere with Civil Rights)

207.   Plaintiffs refer to paragraphs 36 through 95, above and by such reference incorporate same herein as set forth in full.

208.   Defendants, DAVIS, AEFA/AMERIPRISE, B&F, DYKEMA, R&P, GLICKMAN, STERN, MARH, LANGER, MAHAVIER, FAIRSHTER, BENNETT, DONAHUE, CHIA, conspired together for the purpose of impeding hindering, obstructing, or defeating, in any manner, the due course of justice, with the intent to deny or specifically not inform  the Plaintiff in his capacities as an individual and as an executor that the ESTATE had to be specifically named in either the Superior Court(LC 060762) filing in 2002, NASD filing in 2002,    The second part of the conspiracy  was continued when GLICKMAN filed the legal malpractice lawsuit deceitfully informing Plaintiff that the ESTATE was part of the said lawsuit. STERN continued said conspiracy when he filed the federal lawsuit(CV-09-3179 GHK), Ameriprise state case(BC435030) and then when he took over the legal malpractice case(BC394851) and also when he filed the legal malpractice case(BC.408161). LANGER, MARH continued the conspiracy by naming the ESTATE as part of the legal malpractice lawsuit(BC394851) in a deceptive manner only.  MAHAVIER continued the deception by not informing Plaintiff that the ESTATE was not part of the lawsuit.

209.  Defendants GLICKMAN,  BENNETT, FAIRSHTER, CHIA, DONAHUE, DYKEMA,  R&P, and DYKEMA  conspired to obstruct justice when they did not inform Plaintiff that the first appeal did not include the ESTATE  sought to be impeding, hindering, obstructing, or defeating,, in any manner, the due course of justice, with the intent to deny Plaintiff in his various capacities due process of law, equal protection of the laws.

210.  Defendants , DAVIS, B&F, DYKEMA, R&P, , GLICKMAN, DONAHUE,  MARH, LANGER, MAHAVIER,  CHIA, FAIRSHTER, STERN and  conspired to obstruct justice when they did deliberately did not inform the

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

courts in cases LC060762, federal court case #CV09-3179, BC 394851 and Case BC435030  through appropriate filings of the significance of the NASD ruling.

211.  All defendants  conspired  for the purpose of impeding, hindering, obstructing , or defeating, in any manner,  the due course of justice, with the intent to deny  to Plaintiffs  the equal protection of the laws, or to Plaintiffs or his property for lawfully enforcing  or attempting to enforce the rights of the Plaintiffs to the equal protection of the laws.

212.  All Defendants', and each of them, violated the Conspiracy to Obstruct Justice Act  42 USC § 1985.

<u>Ninth Claim of Relief</u>

(Against all Defendants)

(FRAUD)

213.  Plaintiffs refer to paragraphs 36 through 95, above and by such reference incorporate same herein as set forth in full.

214.   The Defendants, and each of them, perpetrated on the Plaintiffs resulted in the Plaintiffs severe financial loss.

215.  The Defendants acts were the direct and proximate cause of Plaintiffs severe financial loss.


<u>Tenth claim of Relief</u>

(Against all Defendants)

(Breach of fiduciary Relationship)

216.  Plaintiffs refer to paragraphs 36 through 95, above and by such reference incorporate same herein as set forth in full.

217.  At all times relevant to this action, there existed between Plaintiffs and Defendants, and each of them, a fiduciary and/or confidential relationship upon which  Plaintiff justifiably relied on to their detriment.  By virtue of their relationship between Plaintiffs and Defendants, and each of them, fiduciary duty

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

existed . Pursuant to said duty, Defendants, and each of them, owed the utmost good faith and fairness to Plaintiffs in all matters pertaining to Defendants 'conduct with respect to Plaintiffs ' assets and property.

218. Defendants, and each of them, accept the reliance of Plaintiffs on the fiduciary and/or confidential relationship.

219. Defendants, and each of them, breached the aforesaid duty as alleged herein, and in doing so gained an advantage over Plaintiffs in matters relating to the management and control of Plaintiffs' assets and Plaintiffs' Accounts. In particular and without limiting the generality of the foregoing , in breaching said duty(ies) as alleged herein, Defendants, and each of them, are required to disgorge their profits, and Plaintiffs are entitled to an aware in the amount of these profits, interest on all such sums from date of injury.

## Eleventh Claim for Relief

### (Against Defendant STATEBAR only)

### (State Bar Act of 1927)

220. Plaintiffs refer to paragraphs 36 through 95, above and by such reference incorporate same herein as set forth in full.

221. Benninghoff v. Superior Court (State Bar of California) (2006) 136 CA4th 61, states, in part,

> "The [State Bar] Act does not regulate practice
> before United States courts." (Birbrower, supra, 17
> Cal.4th at p. 130.) Rather, "[t]he State Bar Act and
> other statutes enacted for the purpose of regulating the
> practice of law in this state are applicable to our state
> courts only." (In re McCue (1930) 211 Cal. 57, 66.) [11]
> More broadly, state law cannot restrict the right of
> federal courts and agencies to control who practices
> before them. In Sperry v. State of Florida (1963) 373
> U.S. 379, the United States Supreme Court vacated a state
> court injunction prohibiting a layperson from
> representing parties in the U.S. Patent Office. (Id.at
> pp. 381, 404.) The court conceded that patent prosecution

constitutes the practice of law, and that Florida law validly prohibited laypeople from practicing law in the state. (Id. at p. 383.) But federal regulations allowing nonlawyers to prosecute patents preempted state laws barring the unlicensed practice of law. (Id. at pp. 384-385.) The court concluded that a state "may not deny to those failing to meet its own qualifications the right to perform the functions within the scope of the federal authority." (Id. at p. 385; see also Augustine v. Department of Veterans Affairs (Fed. Cir. 2005) 429 F.3d 1334, 1339-1340 ["state law purporting to govern practice before a federal administrative agency would be invalid. [¶] .

Therefore, it is clear from the court's transcript that the State Bar Act that requires only members of the bar from prosecution on behalf of an ESTATE that Plaintiff was informed by letter and emails from Defendants' DYKEMA AND B&F's counsel, is only applicable in state courts.

222. Therefore, the state law which forbids in Po Se representation on behalf of an Estate is not controlling in this federal court.

## Twelfth Claim for Relief

### (Against all Defendants)

### (False Pretenses/Conversion).

223. Plaintiffs refer to paragraphs 36 through 95, above and by such reference incorporate same herein as set forth in full

224. Obtaining property by false pretenses is when a person obtains property by intentionally misrepresenting a past or existing fact. Plaintiff gave DAVIS $10,000, gave B&F approximately $150,000, gave R&P approximately $50,000, gave GLICKMAN and GLICKMAN & GLICKMAN $5000.00, gave STERN in excess of $42,500, gave LANGER and MARH $3500, gave MAHAVIER $7,500. B&F compelled Plaintiff to end up paying forensic accountant Jim Gill approximately $150,000. MAHAVIER compelled Plaintiff to give to Scott Harris $7,500. GLICKMAN, FAIRSHTER, PHAN, DONAHUE, BENNETT, CHIA,

B&F, DYKEMA, AEFA/AMERIPRISE  compelled Plaintiff to give to Yarnall for the 1st appeal $20,000 and for the 2nd appeal $13,000.

225.   Defendants, and each of them, committed the act of False Pretenses/conversion when they deceived Plaintiffs in thinking that Defendants were gong to do actions that they had promised whether in the nature of financial advice and/or legal advice and, instead, took the monies with no intention of providing such services.

## Thirteenth Claim for Relief.

### (Against all Defendants)

### (Americans with Disabilities Act(ADA))

### ( 42 USC  §§ 12101  et seq.)

226.   Plaintiffs refer to paragraphs 36 through 95, above and by such reference incorporate same herein as set forth in full

227.   Defendants, each of them, deprived Plaintiffs of Plaintiffs' federal constitutional and /or statutory right by failing to provide Plaintiffs with the legal and financial services that they promised to provide since each of the defendants had specific knowledge  that the Plaintiff suffered  from a developmental disorder with severe learning disabilities.

228.   Defendants, and each of them, have acted under the color of state law when Defendants, and each of them, deprived Plaintiffs their federal rights, property interests and otherwise discriminated against Plaintiffs based on Plaintiff'sdevelopmental  disorder with severe disabilities.

229.   As a direct and proximate result of Defendants' violations of  42 USC §§ 12101  et seq, Plaintiffs  have sustained  grave financial loss.

## Fourteenth Claim for Relief

COMPLAINT FOR VIOLATION OF AMERICAN WITH DISABILITIES ACT , ELDER ABUSE, AND OBSTRUCTION OF JUSTICE

(Professional Legal Malpractice: Fraud )

(CA Business and Professions Code § 1068)

230.  Plaintiffs refer to paragraphs 36 through 95, above and by such reference incorporate same herein as set forth in full

231.  All Defendant law firms did perform their legal services with the intent to deceive, manipulate Plaintiffs to Plaintiffs' great financial loss.

232.  Such fraudulent and deceitful acts of defendants' law firms or through their agents violated Business and Professions Code § 1068.

## VI.  **Prayer for Relief**

PLAINTIFFS respectfully request this Court order, adjudge and decree:

A. Plaintiffs be awarded core damages in the amount of $21,000,000.00 which is the estimated damages that forensic account Jim Gill computed; or, in the alternative actual damages, according to proof..

B. Plaintiffs recover from Defendants, and each of them, threefold in actual damages sustained as a result of said Defendants' federal antitrust ,RICO and unfair competition violations.

C. Plaintiffs be awarded interest on all damages sustained by Plaintiffs from January 2000 until paid in full.

D. Defendants AEFA's AMERIPRISE's , COHEN's, and STATEBAR's conduct as alleged , unlawful  under Section 1 of the Sherman Act(15 USC § 1)

E. Plaintiffs recover from Defendants, and each of them, Plaintiffs' costs and reasonable attorney fees as provided by the RICO Act and the California Welfare and  Institutions  Code for Elder Abuse.

F. Plaintiffs recover from Defendants, and each of them, punitive and exemplary damages for Elder Abuse as defined in the Welfare and Institutions Code § 15600 et seq.

G. Disgorgement from Defendants, and each of them, the profits they obtained from Plaintiffs as a result of said Defendants' elder abuse and pursuant to the RICO act.

H. Plaintiffs be awarded such other and further relief in law or in equity as the Court may deem just and proper.

PLAINTIFFS respectfully request this Court order, adjudge and decree the following Declaratory Relief:

1) This Court order AEFA/Ameriprise to produce evidence of logs, showing where, when and to whom it produced documents to as stated in its January 2012 Objection.

2) This Court order that the STATEBAR, when an investigation of a member is instituted by the STATEBAR's investigation unit, such will be noticed on the individuals member Calbars website page. Furthermore, that such member shall notify any current client or prospective client that such investigation has commenced. This notification shall be in writing.

3) The Court hold that State Bar Act Rule requiring that only members of the bar can file suit on behalf of a third party, i.e. ESTATE , is unconstitutional under the US. Constitution and the Constitution of California.

4) This Court order that any company who provides services for members of the bar to due discovery work, i.e. Taking of depositions, paralegals, making "appearances for attorneys", cannot discriminate between members of the bar and In Pro Se clients.

Dated:   July 30 , 2012

ROBERT BAKER

In Pro Per

# Exhibit 1

DE-150

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and Address): | TELEPHONE AND FAX NOS.: | FOR COURT USE ONLY |
|---|---|---|

Allan B. Cutrow, Esq. (SBN 56353) (310) 312-3744
Mitchell, Silberberg & Knupp LLP (310) 312-3789 fax
11377 W. Olympic Blvd.
Los Angeles CA 90064

**ATTORNEY FOR (Name):**   Allen R. Baker & Frank A. Baker

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Los Angeles
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: 111 North Hill Street
CITY AND ZIP CODE: Los Angeles                    90012
BRANCH NAME: Central

FILED
LOS ANGELES SUPERIOR COURT
AUG 09 2001
JOHN A. CLARKE, CLERK
BY _____ DEPUTY

**ESTATE OF (NAME):**
KATE BAKER
                                                    DECEDENT

|  | **LETTERS** |  |  |
|---|---|---|---|
| [X] | TESTAMENTARY | [ ] | OF ADMINISTRATION |
| [ ] | OF ADMINISTRATION WITH WILL ANNEXED | [ ] | SPECIAL ADMINISTRATION |

**CASE NUMBER:**
BP 065 390

## LETTERS

1. [X] The last will of the decedent named above having been proved, the court appoints (name):
ALLEN R. BAKER, FRANK A. BAKER &
ROBERT BAKER

   a. [X] Executor
   b. [ ] Administrator with will annexed

2. [ ] The court appoints (name):

   a. [ ] Administrator of the decedent's estate
   b. [ ] Special administrator of decedent's estate
      (1) [ ] with the special powers specified in the Order for Probate
      (2) [ ] with the powers of a general administrator
      (3) [ ] letters will expire on (date):

3. [X] The personal representative is authorized to administer the estate under the Independent Administration of Estates Act [ ] with full authority [X] with limited authority (no authority, without court supervision, to (1) sell or exchange real property or (2) grant an option to purchase real property or (3) borrow money with the loan secured by an encumbrance upon real property).

4. [ ] The personal representative is not authorized to take possession of money or any other property without a specific court order.

WITNESS, clerk of the court, with seal of the court affixed.

Date: **AUG 09 2001**

Clerk, by **John A. Clarke**
_____ (DEPUTY)

## AFFIRMATION

1. [ ] PUBLIC ADMINISTRATOR: No affirmation required (Prob. Code, § 7621(c)).

2. [X] INDIVIDUAL: I solemnly affirm that I will perform the duties of personal representative according to law.

3. [ ] INSTITUTIONAL FIDUCIARY (name):

   I solemnly affirm that the institution will perform the duties of personal representative according to law. I make this affirmation for myself as an individual and on behalf of the institution as an officer.
   (Name and title):

4. Executed on (date): 7/25/01
   at (place): San Fernando City
   _____, California.

   _____
   (SIGNATURE)

## CERTIFICATION

I certify that this document is a correct copy of the original on file in my office and the letters issued the personal representative appointed above have not been revoked, annulled, or set aside, and are still in full force and effect.

Date: **OCT 04 2005**

Clerk, by **John A. Clarke, Clerk**

_____ (DEPUTY)
PATRICIA JOHNSON

Form Approved by the
Judicial Council of California
DE-150 (Rev. January 1, 1998)
WWW.ATFORMS.COM  1-800-417-4302
Mandatory Form (1/1/2000)

**LETTERS**
(Probate)

Probate Code, §§ 1001, 8403,
8405, 8544, 8545;
Code of Civil Procedure, § 2015.6

ORIGINAL

# Exhibit 2

Jane Van Buren, Ph.D.
1328 Westwood Blvd. #7
Los Angeles, CA 90024

May 15, 2007

To Whom It May Concern:

I am writing to you as Dr. Robert Baker's analyst. I have treated him for seven years and even though he has made excellent strides in his ability to read and write, he still has some difficulties reading and writing. He therefore needs extra time to complete his licensing exam.

Thank you for your attention to this matter.

Sincerely,

Dr. Que An Duran
R P 018
Dr. Jane Van Buren

# Exhibit 3

## Main Identity

| | |
|---|---|
| **From:** | "R. Anthony Mahavier" <ramahavier@mahavier.com> |
| **To:** | "'Scott S Harris'" <scott@scottsharrislaw.com>; "'Dr Robert Baker'" <drrobertbaker@adelphia.net> |
| **Sent:** | Thursday, September 15, 2011 11:32 AM |
| **Subject:** | Bennett - t/c Philip Aidikoff |

FYI

I spoke this morning with Phil Aidikoff about the possibility of his serving as an expert on the standard of care for counsel in the NASD arbitration, etc. I told Phil that we would try to put something together for him, in terms of a case description and with documents ASAP in order to determine if he would be willing to serve as a testimonial expert. I have also reviewed his firm web page. His area of practice is spot on in terms of what we'd need. We did not talk about what his retainer or hourly would be for the work.

Not surprisingly, he immediately wanted to focus on what the AMEX arbitration and case would have been about. This is, indeed, what I have been trying to get us to focus on here: what the money was invested in, why, trades made, etc. Phil suggested that we talk in terms of "asset allocation" and "failure to supervise". I discussed with him the issue about a possible dismissal on standing grounds and an allegation that it could have been avoided had Dr. Bob been listed as a Claimant via his status as an executor or trustee. I did not discuss with him the AMEX purported defense that Bob was neither.

With regard to the "case in the case", he suggested that we contact Paul Meyer, (of or formerly with Smith Barney) to serve as an expert on the standard of care for brokers/dealers. We can contact Paul at 310 917 1075.


Tony
R. Anthony Mahavier, A.P.L.C.
2550 Fifth Avenue, 9th Floor
San Diego, CA  92103
(619) 233-3760 office
(619) 851-5986 cell
(619) 270-9810 fax
Assistant: Theresa Owens secretary@mahavier.com

www.mahavier.com
Twitter.com/#!/CALawGuy
Facebook.com/CALawGuy

This email is for the sole use of the intended recipient(s) and may contain attorney-client or attorney work product or other confidential and privileged information. Any unauthorized disclosure, distribution or use is expressly prohibited. If you are not the intended recipient, please contact the sender and destroy all copies of the message.

🌳 Please consider the environment before printing this email.

This document includes information with references to documents. The references are included as endnotes in this document, and Reference Packages containing documentation referred to in this document are included as separate files. By double clicking on any endnote reference in the text, you will be taken to the endnote. By double clicking on the endnote number, you will be returned to the position of the reference in the text. Holding the cursor over an endnote number in the text will show the endnote contents.
Some work is still in progress, and is noted as such in the endnotes.

## Background Information

Supporting documentation relies largely on a 2005 AEFA partial production, along with documents received from other sources after the accounting work was halted at the direction of Bennett & Fairshter and Dykema, pending anticipated further document production by AEFA in 2005 and 2006. AEFA did not produce documents for the 1994 Baker Family Limited Partnership or for the Kate Baker IRA. They produced most statements and limited account documentation for the 1982 Baker Family Trust, Robert Baker's accounts, and the 1982 Robert Baker Trust.
Forensic accountant Jim Gill, CPA suggested a method to calculate the expected value of the portfolios. Gill's method involves determining the value of assets transferred from Bear Stearns to AEFA, any documented deposits/additions, and any documented withdrawals. For each date of activity, the portfolio valuation can be determined, based upon designated asset allocations, which are different for the Family Accounts (Family Trust, Family Partnership, Kate Baker IRA) and the Robert Baker account. When information was not available, estimates were made. Following the direction of Bennett & Fairshter and Dykema from 2005 and 2006, damage calculation assumes improper and/or unauthorized transactions when AEFA documentation was not produced for certain accounts or transactions.

Family Accounts Assumptions
1. The asset allocation for the Family Accounts is based upon market index benchmarks, allocating 70% to the S&P 500 Index values and 30% to the NASDAQ Composite Index values.
2. The Family Accounts have adjustments to subtract estimated tax liability which would have been incurred if assets from Bear Stearns had been liquidated at the time of transfer. No supporting withdrawal documentation has been produced by AEFA. My mother frequently told me that she was not withdrawing money from these accounts because she wanted to grow them for me and my brothers, and she also told me that she deposited her required IRA distributions into the Family Trust and/or Partnership accounts at AEFA.

Robert Baker Account Assumptions
3. The asset allocation for the Robert Baker account is 25% to the S&P 500 Index values, 25% to the NASDAQ Composite Index values, and 50% to Firsthand Funds

mutual funds. I had repeatedly told Cohen that I wanted my account invested predominantly in Firsthand Funds, especially after I began liquidating my personal assets held outside AEFA and depositing them in the Robert Baker account. I also told him that I wanted the rest of my portfolio invested in the stock market, with emphasis on high tech investments. When I first transferred my assets to AEFA, there was only one fund from Firsthand Funds, and in the next few years, they added two more. The 50% Firsthand Funds allocation is divided among funds as new ones were made available. As Firsthand Funds offered new funds, I asked Cohen to invest my deposited assets in them.

4. Adjustments are made and the portfolio valued at each point for deposits and withdrawals, as this was my personal account and I have knowledge and documentation of my transactions. There are some deposits which I recall, but do not find in the AEFA produced documentation. These are not included in the valuation calculation, because they are not documented. Gill suggests that they be included in adjustments to the total damages amount.

## Expected Values of Family and Robert Baker Accounts

See attached schedules for details regarding transfers into AEFA, deposits, and withdrawals, as well as calculations of expected portfolio valuations.[1]

From January through April 1996, Kate Baker transferred a total of about $5,389,380.39 from the 1982 Baker Family Trusts, the 1994 Baker Family Limited Partnership, and the Kate Baker IRA from Bear Stearns to AEFA. In May 1997, she transferred assets of about $71881.29 from a Glenbrook Life Annuity to AEFA. If her assets had been invested in securities representing the allocation of 70% S&P 500 and 30% NASDAQ Composite, the expected value on the date of her death, January 28, 2000, would be about $14,423,370.20.[2]

From May 1996 though June 1996, I transferred a total of about $405,841.72 from Bear Stearns to AEFA. I deposited a total of about $492,132.49 of my own assets before I lost control over the account in January 1999. After I lost control over the account, deposits totaling about $47,347.87 were made to the account. Withdrawals by me total about $356,467.97. If the assets had been invested in securities representing the allocation of 50% to Firsthand Funds mutual funds, 25% S&P 500, and 25% NASDAQ Composite, the expected value on the date of Kate Baker's death, January 28, 2000, would be about $3,469,468.89.[3]

The total expected value of both the Family Account and Robert Baker portfolios is about $17,892,839.10.

On the attached schedule, adjustments are noted for distributions made from Family and Robert Baker accounts, amounts due me from improper distributions by AEFA, and

deposits which I made to my account, but are not documented in AEFA produced documents. Estimated other damages[4] include losses I have incurred due to the actions of Cohen, AEFA, and Ameriprise, such as having to sell my personal residence, legal costs, and legal fees paid to lawyers who represented me against Cohen and AEFA. The other damages amount is an estimate, and is still being documented to compute a precise amount.

The adjusted damage amount is about $15,822,086.70.

This adjusted damage amount does not include any interest or Elder Abuse damages, which are computed on the attached schedule.

## Timeline Notes

1. I transferred my assets to AEFA from Bear Stearns in May and June 1996.[5]  I had full control over my account and assets at Bear Stearns, where it was registered and reported under my personal SSN.[6]  My mother and I had established my account as a Totten Trust, without a Trust document, whereby she would inherit the assets should I predecease her, and the assets would be mine should she predecease me. The initial account application[7] I signed to establish the AEFA account named me as the account owner, and shows my personal SSN, address, and other personal information. It indicates that this is an individual account. The application was altered after I signed it, changing my name as the account owner to the name of 'Robert Baker Trust dated 7/30/85'. In addition, a slash after my signature was added along with Kate Baker's name on the signature line as an apparent cosigner. Upon transfer, Cohen changed the registration of my assets from my personal SSN to Kate Baker's personal SSN. In about June 1998, the registration was changed to my personal SSN.[8]  During the 12/2002 NASD hearing of the AEFA Motion to Dismiss, which was not granted, the NASD arbitration panel chair asked that the original of this application be produced for the panel. AEFA never complied.

2. I instructed Cohen to invest most of my assets specifically in Firsthand Funds and that the remaining assets should at least keep pace with the technology segment of the market and the market as a whole.

3. In 1997, I deposited additional funds, and in 1998, I began liquidating assets held outside AEFA and depositing them, informing Cohen in early 1998 that I was liquidating assets so that Cohen could continue to invest in Firsthand Funds and take advantage of the market performance at that time. Once I completed the liquidation and deposits in late 1998, I told Cohen that he now had all my money. In January 1999, Cohen caused me to lose control over the account, and removed my authority to transact on my account. Cohen assured me that full control would be restored to me upon Kate Baker's death. Cohen told me he would transfer $5000 each month from the Robert Baker account to a new AEFA check writing account he set up for me.[9]

4. Kate Baker transferred assets under her control at Bear Stearns in Family Trust, Family Partnership, and her IRA to AEFA from January 1996 through April 1996.

5.  In about February 1996, Cohen contacted me by phone and introduced himself as the broker who was taking over my mother's assets from Bear Stearns, including the Family Partnership. He told me he was highly experienced and would obtain great returns for the family assets, and that Kate Baker had told him she wanted to invest in the stock market to grow the assets for her children. He also told me that the Bear Stearns broker did not know what he was doing in terms of investing. I began to think I should transfer my account to Cohen as well.

6.  Cohen visited Kate Baker at her home about once each month, on the first Monday, to discuss her investments and obtain her signature on any account documents. He also gave her a document, which appears to be created by word processor, summarizing the Kate Baker portfolio values, with the words "Kate Baker accounts" in the title.[10] The summary included the 1982 Baker Family Trust, 1994 Baker Family Partnership, and the Kate Baker IRA. It did not include my account.

7.  On about March 9, 1999, Cohen visited Kate Baker at her home for the final time.[11] That morning, Kate Baker had been advised at a doctor's appointment documented in her medical records that she had inoperable pancreatic cancer and had about 4-6 months to live.[12] He presented her with a revised Will, an amendment to the 1994 Baker Family Partnership, and a 'Designation of Assets' authorizing transfer of assets consistent with the Will and Partnership changes.[13] She appears to have signed the Will, although a forensic document examination cannot confirm her signature. She also appears to have signed the Partnership amendment and Designation of Assets, which are also dated March 9, 1999. The Will appears to change terms of the 1982 Baker Family Trust which are irrevocable at the time, changing distribution from immediate to a 20-year payout.[14] It also appears to attempt to limit Kate Baker's control over the partnership. Cohen signed the Will as a witness. Two other witness signatures are Jason Semeleng,[15] Cohen's then assistant, and Cohen's mother. The Designation of Assets document is notarized by another AEFA advisor, Dennis Muehlenbach,[16] who worked in Cohen's office at that time. The Will has apparent inconsistencies in the stated number of pages versus the actual number of pages and in references to the Baker Family Trust. The Will has a handwritten change, which is initialed 'KB', to designate Carole Baker as a successor executor should one of her sons predecease her. Carole Baker's name is misspelled. Cohen told my lawyer in 2000 that lawyer Tad Callister had prepared the 1999 Will. When my lawyer contacted Callister, Callister stated that he did not prepare the Will and did not have a file for Kate Baker. In a later conversation, Callister stated that Cohen had refreshed his memory and that he had modified the Will, but he had never met nor talked with Kate Baker.[17] In 2005, Callister produced documents relating to the Will, the Partnership amendment, and the Designation of Assets. The file documents contained a letter from Callister to Cohen, delivering copies of the Will, Partnership amendment, and the Designation of Assets, and instructing Cohen in how to execute the Will. The documents also included a bill for services for $300.00, addressed to Cohen at his office address. The bill was dated in March 1999, but contained firm information including names of firm lawyers with

California Bar numbers, which had been issued after 1999. No payments from Kate Baker to Callister have been found.[18]

8. On about October 31, 1999, Kate Baker wrote a check from her non-AEFA checking account to Allen Baker for $60,000, asking him to deposit it into a joint account they held together.[19] She requested that he pay her bills for her, since she no longer felt comfortable doing it for herself, and she had trouble writing clearly at this time.

9. Kate Baker died on January 28, 2000, aged 81.[20]

10. Upon Kate Baker's death, I instructed Cohen that my assets in the Robert Baker account as well as my ⅓ share of the Baker Family Accounts should be liquidated to cash before March 10, 2000 to avoid an impending market downturn.[21]

11. On about February 9, 2000, I sent a letter to AEFA notifying them to liquidate the Robert Baker accounts.[22]

12. On about February 14, 2000, Allen Baker informed me that Cohen told Allen a trust document controlled my account, and that Allen was now trustee.[23]

13. Allen, Frank, and I all met with Cohen on February 29 and March 2, 2000 to discuss distribution of the Family Accounts. I reiterated my instruction to Cohen that my assets and my ⅓ share of the Family assets be liquidated to cash before March 10, 2000. Allen instructed Cohen to liquidate the Family assets for immediate distribution to the three of us, further stating that they did not have to be concerned about a market downturn because the Family assets would be distributed. I informed Allen and Cohen that I did not want Cohen or AEFA managing the Robert Baker account, and that I wanted to transfer the assets to another brokerage. Allen told me that he knew I did not want Cohen to manage my assets, and that they would be transferred to an account I would designate.

14. At the February 29, 2000 meeting, Cohen told us that he would obtain a trust tax ID number for the Robert Baker Trust, and that he would have American Express Business and Tax Services file the first trust tax return for the Robert Baker Trust.[24] Cohen subsequently changed assets registered with my personal SSN to the new trust tax ID. He failed to change all the Robert Baker Trust account assets tax ID's, and AEFA did not send me the Robert Baker Trust tax statements for those assets still under my personal SSN.[25] Cohen refused to send me statements for either Robert Baker Trust or Family Accounts. After repeated requests from me and my lawyers, AEFA began sending in them about February 2001.[26] In about 2002, the IRS imposed mandatory backup withholding on all my personal brokerage and bank accounts. After contacting the IRS, they sent me copies of the AEFA 1099's and other tax statements with my personal SSN for what AEFA claimed were Robert Baker Trust assets. After I explained that AEFA had issued erroneous tax statements, the backup withholding requirements were removed.[27]

15. In August 2008, I received both a telephone call and letter from Ameriprise agent Timothy Swanson, who informed me as a trustee of the 1982 Baker Family Trust, that Ameriprise had conducted a tax audit on the 1982 Baker Family Trust Account for the taxable year 2000, and my brothers and I were due to receive about $29,000 each. I followed the exact procedure as described by Mr. Swanson in his letters to recover my monies and received a "cease and desist" letter from Ameriprise counsel

Elizabeth Lowery.  On the instructions of my counsel, I have not made further contact with Ameriprise.  I do not know whether my brothers received their monies.[28]

## Buy High/Sell Low and Churning Examples

1. Robert Baker Wealth Management Account #2300-6836-3-021 shows both buy high/sell low and churning patterns.  The account held individual stocks.  This account was established in April 1998, when I informed Cohen that I was liquidating his assets held elsewhere to give them to Cohen so that Cohen could invest in more of my assets in the market and in Firsthand Funds.  From April 1998 to 1/28/00, the account lost value.  After Kate Baker's death, all assets in this account were transferred to a new Wealth Management Account #2306-3993-2-021, where the patterns continued.  During the entire period these two accounts were held at AEFA, the value declined.  An attached schedule shows transactions and returns.[29]

2. Buy High/Sell Low patterns from 2000-2002 in the following Family Accounts[30]:
   1982 Baker Family Trust, Survivors Trust, Share A
       Account Number 1585-7527-4-021
   1982 Baker Family Trust, Decedents Trust
       Account Number 1585-7832-8-001
   1994 Baker Family Limited Partnership
       Account Numbers:  1617-0433-3-002
                         0010-4722-5036-3-002
                         0011-9722-5036-6-002
                         0012-9722-5036-4-002
                         0023-2722-5036-8-002
                         0030-6722-5036-9-002
                         0033-1722-5036-8-002

   In these accounts, Cohen invested the assets beginning in December 2000 primarily in mutual funds which were at high risk of losing value as the market was in downturn and poised for further losses.  Account documents for the 1994 Baker Family Limited Partnership were not produced by AEFA.  I did not sign any of these account documents and was not aware of Cohen's investments prior to his taking these actions.  At about October 2000, the Family Assets were largely in cash.[31]  After Estate Taxes were paid, Cohen systematically invested the assets into high risk and some high tech focused mutual funds, beginning in December 2000.  He continued purchases of these investments while the market was in downturn, at the same time as my brothers and I were expecting to distribute these Family assets.  Attached schedules show transactions and returns.  Although my name appears on the signature lines of account applications produced by AEFA, I did not sign these documents.[32]  These applications authorized opening accounts, but did not include any authorizations for purchases or sales.

3. Kate Baker's IRA assets were transferred to AEFA from Bear Stearns, where holdings consisted of various convertible and preferred securities, as well as income funds.[33]  AEFA has refused to produce documents related to Kate Baker's IRA.  IRA assets were liquidated at an unknown time and reinvested in a combination of stocks

and AEFA proprietary mutual funds.[34]  The stocks were held in Wealth Management account #2260-6768-4-021. Information about the IRA is obtained from a few scattered statements in 1997 and 1998, and statements for December 1999 and January 2000. During the 1997 and 1998 months, the Wealth Management account suggests the same type of churning pattern as seen in Robert Baker's Wealth Management accounts.[35]  From the little information available, it is not possible to confirm buy high/sell low patterns for this account; although many of the same stocks are present in both the IRA and the Robert Baker Wealth Management accounts.

## Annuity Purchases

1. After transfer of the Family Trust and Partnership assets to AEFA, Cohen purchased annuities in 1996 with cash which was transferred from Bear Stearns. Cohen also liquidated some stock holdings transferred from Bear Stearns, using the proceeds to purchase annuities in 1996. He then began systematically purchasing AEFA proprietary annuities after holding income earnings and proceeds from sale of securities from these accounts until there was enough for an initial annuity premium.[36]

2. A total of 12 proprietary AEFA annuities were continually purchased from February 1996 to January 2000. Continued premium additions were made for 7 of these annuities,  and automatic investments were established at regular intervals, usually monthly. These automatic investments were purchases of primarily AEFA proprietary mutual funds and mutual funds with companies AEFA seemed to have sort of relationship with. 1 of these 7 annuities was invested in AEFA proprietary mutual funds, but did not have automatic investments. The mutual funds appear to be funds investing in a combination of aggressive growth, growth/income, international growth, and large capitalization securities. AEFA apparently also had proprietary funds with the same names available for direct investment without annuity purchase.[37]

3. The remaining 4 were single payment annuities, invested in what appear to be AEFA proprietary fixed income, S&P 500 index, and money market type funds.[38]

4. According to the January 31, 2000 AEFA combined monthly statement, annuities comprised approximately 64% of the entire Family Trust, Family Partnership, and Kate Baker IRA portfolio.[39]

5. Partial annuity surrenders appear on IDS (subsidiary of AEFA) produced documents for November 1997, April 1998, and June 1998 for a total of about $66,307.[40]  No surrender request documentation was produced. Funds were available in other cash and mutual fund accounts. No matching deposits appear in Kate Baker's non-AEFA checking account records.

6. On about January 20, 2000, Cohen executed a liquidation of two accounts held with Putnam, totaling in excess of $1,000,000. A Letter of Authorization with Kate Baker's name signed was Signature Guaranteed by another AEFA representative in

Cohen's office at that time.  Putnam produced documents show that several telephone transfers were requested by Jason Semeleng, Cohen's then assistant. Putnam issued checks based upon these phone requests and the Letter of Authorization, liquidating both of these accounts completely.[41]  On about January 25, 2000, Cohen accepted the Putnam checks for deposit into the Family Trust and Family Partnership.  Kate Baker's name was signed as endorsement.  Cohen used the proceeds of these deposits to purchase 2 proprietary AEFA annuities, one for the Family Trust and one for the Family Partnership, with premiums for each in excess of $500,000.  Kate Baker's name and initials were signed on annuity contracts for these annuities.[42]  Kate Baker's hospice records show that she was taking many medications, including morphine for pain, and that her condition was documented as "actively dying" around this time period.[43]

7.  For the 12 annuities bought for the Family Accounts, IDS produced annuity contracts and transaction listings.  No death claim documents were produced.  10 of these death claim transactions were dated for March through October 2000.  The remaining death claims were dated for May 2002.[44]  I recall signing death claims in late 2000 and receiving documents for the May 2002 death claims.  I did not sign any death claim paperwork for early 2000.

8.  Annuity account 9300-5176-084-9 was held in the name of Kate Baker.  The contract date is 2/13/96, and the death claim date is in May 2002.  IDS produced documents show that the named beneficiaries are the 1982 Baker Family Trust and my two cousins, Fred and Lori Landau.  IDS and/or AEFA did not pay my cousins when the annuity was terminated and death claim benefits paid to the 1982 Baker Family Trust.  I was unaware of this beneficiary designation until IDS produced documents in 2005.[45]

9.  In about June 1996 and May 1997, Cohen purchased a proprietary AEFA annuity for my account, for which continued premiums were paid after the initial premium and had automatic investments established at monthly intervals.[46]  These automatic investments were purchases of primarily AEFA proprietary mutual funds and mutual funds with companies AEFA seemed to have sort of relationship with.  The mutual funds appear to be funds investing in a combination of aggressive growth, growth/income, international growth, and large capitalization securities.  AEFA apparently also had proprietary funds with the same names available for direct investment without annuity purchase.

10. In about March 2000, Cohen purchased a proprietary AEFA annuity for the Robert Baker Trust account, even though Cohen had been informed that AEFA would not be managing my assets about 3 weeks earlier.[47]  AEFA proprietary annuities are not transferable, since other financial institutions I have consulted have told me they do not accept them.  An initial premium and one future premium were paid and automatic investments were established at monthly intervals.  These automatic investments were purchases of primarily AEFA proprietary mutual funds and mutual funds with companies AEFA had some sort of apparent relationship with.  The mutual funds appear to be funds investing in a combination of aggressive growth, growth/income, international growth, and large capitalization securities.[48]  The

second premium for this annuity was deposited by Cohen, even though AEFA produced account documentation shows a handwritten note, which appears to be consistent with Cohen's handwriting, next to a copy of a check for a Family Trust distribution, which was directly distributable according to trust terms to me. The note states that this is my distribution, but that he put it into the Robert Baker Trust because Allen said that I did not call him back. This note is next to the signature line of the check which shows names of Allen, Frank, and me as signatories.[49]  I did not sign this check and did not know of it until I received a copy from AEFA.

## Purchase of Securities and Transfer to Unknown Accounts

AEFA produced documents show 4/18/2000 and 4/27/2000 purchase of shares of Microsoft and Worldcom stocks for the 1982 Baker Family Trust, Decedents Trust account 1552-3657-3-021, and subsequent 5/08/2000 transfers to an unknown AEFA account. This account number only appears on this AEFA statement as a destination account for these transfer transactions. It does not appear as an account on any account statement with holdings owned by the Family Trusts, Family Partnership, Kate Baker, Kate Baker IRA, Robert Baker, or Robert Baker Trust. AEFA also produced a Letter of Authorization dated 4/25/2000 requesting transfer of these Microsoft and Worldcom shares into the unknown AEFA account. My name is signed, but I did not sign this document and did not see it until produced by AEFA in 2005. The name signed as Frank Baker appears to me that it may not be his signature. No purchase authorization was produced.[50]

## Court Ordered Distributions Made Improperly and Withheld by Cohen and AEFA

Analysis by forensic accountant Jim Gill CPA shows that 2002 distributions from the Family Trusts, Family Partnership, and Robert Baker Trust accounts were improperly handled and that assets specifically designated as mine by court approved agreement among Allen Baker, Frank Baker, and me were withheld from me. Some of these assets were directed to Allen and Frank Baker with their distributions. The remainder of the assets were first transferred to a 2002 trust for the benefit of Robert Baker, then withdrawn without authorization by reversing the funds transfer, and later distributed to Allen and Frank Baker.[51]

In about late April 2002, Cohen sent me account documents for my signature. These documents did not cover all accounts for the Family Trusts, Family Partnership, and Kate Baker assets held at AEFA. They were transfer documents for which only the source account was named with no destination account information provided. Throughout the document package, Cohen indicated in his handwriting where I should sign.

I copied the documents and returned the originals to Cohen noting what was missing and asking him to complete the documents before I signed them.[52]  After several communications, he sent me completed documents. The destination account for all of

my assets was shown as the 1985 Robert Baker Trust account at AEFA, which was improper according to the terms of the court approved agreement.[53]  The objective of the agreement regarding my assets was to move my share of the family assets and what was left of my assets in the Robert Baker Trust account from AEFA and to terminate 1985 Robert Baker Trust account.  I signed the documents allowing Allen and Frank Baker to receive their distributions, and returned the documents transferring my assets into the 1985 Robert Baker Trust account to Cohen, telling him that they were improper and that I wanted documents showing proper handling of my assets.[54]  According to the court approved agreement with my brothers, part of my assets were to be transferred to a new trust, the 2002 Robert Trust, for my benefit at City National Bank, and part were to be distributed to me.  Cohen refused to cooperate and follow the court approved settlement.  City National Bank later attempted to get Cohen's cooperation in transferring my assets, but he again refused to do so.  City National Bank then sent transfer requests to the AEFA Home Office, who eventually transferred most of the assets.[55]

In 2005, AEFA produced account documentation for Robert Baker Trust account 081-3722-5036-5-002.  The documents include a handwritten note on AEFA account transaction documentation dated in April 2002, which is apparently made by Cohen.  He states that Allen told him not to pay me my $5000 monthly distribution from the Robert Baker Trust account, unless I sign the paperwork to "settle Kate's Estate".  His notes also state that I wrote a check on the Robert Baker Trust account for over $6300 to 'MKS'.  I did not write any check on the Robert Baker Trust account at that time, as Cohen had removed my access to my account in January 1999.  The check must have been written by Allen to cover a payment for legal fees to law firm 'MSK'.[56]

Despite multiple requests from 2002-2005, AEFA refused to transfer an annuity held in the Robert Baker Trust account.[57]  Matthew Fairshter advised me that he would file a Claim and Delivery lawsuit, which was filed as Los Angeles Superior Court Case BC-338806.  Fairshter informed me during the last half of 2005 and early 2006 that AEFA and City National Bank were holding up the process of transfer.  In early 2006, Fairshter told me that the judge had insisted that this be settled and that this should prompt AEFA to liquidate and transfer the funds.  Letters in Bennett & Fairshter's and Dykema's internally maintained correspondence files from late 2005 and early 2006 show that, in fact, AEFA was prepared to liquidate and transfer, but that Dykema and Bennett & Fairshter were not responding to their communications.[58]

Eventually, on about 3/3/2006, the annuity was liquidated and proceeds transferred to City National Bank.  A surrender charge was withheld, and the value of the transferred assets was $159,181.80, according to the City National Bank statement.  The annuity premiums paid AEFA totaled $168,000.[59]


## Unauthorized Withdrawals from Family Trust and Partnership Accounts

Some withdrawals appear on AEFA produced transaction statements for 1982 Baker Family Trust held by Kate Baker until January 2000.  No supporting documentation for

these withdrawals was produced.  The first appears as a 8/27/1997 transaction for the 1982 Baker Family Trust for about $1572.00.  Three transactions from about June 1998 to August 1998 appear as transactions totaling about $45,502.00.[60]  Beginning in March 1999, when Kate Baker signed the changed Will and 1994 Family Partnership amendment presented to her by Cohen, the amounts and frequency of transactions increase until late 1999 and January 2000, when numerous very frequent withdrawals appear on the statements.  Kate Baker's non-AEFA checking accounts do not show matching deposits.[61]

On about October 31, 2000, Kate Baker had put funds in a non-AEFA checking account, so that Allen Baker could pay her bills, as she was having trouble writing.[62]
Several AEFA produced documents show transfers to other unknown accounts. Transfers to unknown account 019-1283-9613-2-013 include 1/4/2000 transfer document with Kate Baker's name on a signature line from the 1982 Trust Share A and a 1/12/99 authorization for a regular monthly transfer, noting 'Application Attached' for the unknown account number.  No such application was produced.[63]

## Forgeries on account documents and checks resulting in Improper and Unauthorized Transactions

1. Initial account application I signed was altered without my knowledge to change the account name from 'Robert Baker' to 'Robert Baker Trust dated 7/30/85'.  Kate Baker's signature was added without my knowledge as a cosigner.[64]
2. Without my knowledge, in about October 1999, checks representing proceeds from redemption of a life insurance policy I owned were endorsed with my name and deposited into the Robert Baker Trust account, over which I no longer had control.  I had no knowledge that the policy had been redeemed at that time.[65]
3. Account documents produced by AEFA and IDS in 2005, and signed from 2000-2002 for account creation, Estate Settlement, and account transactions of the 1982 Baker Family Trust and 1994 Baker Family Partnership show my name signed by someone other than me.  On some of these documents, signatures of my brothers do not appear to me to be theirs.
   3.1.   New Account Application for the 1982 Baker Family Trust, Share A, dated 4/11/2000 for account 1585-7527-4-021.  No purchase or sale authorizations were produced, and I have never signed any for this account.[66]
   3.2.   Account Application for the 1982 Baker Family Trust, Decedents Trust, signatures not dated, but AEFA stamped on 3/17/2000 for account 1552-3657-3-021.  Mutual Fund and Certificate Estate Settlement Form, signatures dated 3/2/2000.  Letter of Authorization dated 4/25/2000, authorizing transfer of Microsoft and Worldcom shares to an unknown AEFA account number.  No other purchase or sale authorizations were produced, and I have never signed any for this account.[67]
   3.3.   New Account Application for the 1982 Baker Family Trust, Decedents Trust, dated 4/11/2000 for account 1585-7832-8-021.  No other purchase or sale authorizations were produced, and I have never signed any for this account.[68]

3.4.   New Account Application for the 1982 Baker Family Trust, Share A, dated 3/20/2000 for account 1552-4507-9-021. Mutual Fund and Certificate Estate Settlement Form, signatures dated 3/2/2000 and 3/15/2000. Escrow check dated 4/28/2000 deposited for part of proceeds from sale of Kate Baker's home, with my name as endorsement, which I did not sign. No purchase or sale authorizations were produced, and I have never signed any for this account.[69]

3.5.   AEFA did not produce account documents other than partial transaction statements for the 1994 Baker Family Limited Partnership. IDS produced some documents for annuities held in the name of the 1994 Partnership. On about December 20, 2000. 1994 Partnership purchases of mutual funds were made without my prior knowledge or signature on account opening documents and purchase authorizations. Further purchases and sales were made in these accounts, for which I did not have prior knowledge nor did I sign authorization documents.[70] These transactions were made for account numbers :

> 1617-0433-3-002
> 0010-4722-5036-3-002
> 0011-9722-5036-6-002
> 0012-9722-5036-4-002
> 0015-1722-5036-5-002
> 0022-4722-5036-8-002
> 0023-2722-5036-8-002
> 0030-6722-5036-9-002
> 0033-1722-5036-8-002

4. Checks and Drafts
    4.1.    AEFA did not produce most copies of checks or drafts written on AEFA cash or other accounts. AEFA did produce copies of checks in some cases when they were used as a deposit or purchase for another AEFA account.
    4.2.    I signed three checks written on the Family Accounts after Kate Baker's death.
    4.3.    The first was for a distribution to me in about late April 2000 from the 1982 Baker Family Trust, Decedents Trust, for $325,000. I did not sign checks for my brother's distributions.[71]
    4.4.    The second was for a distribution to me in about April or May 2001 from the 1982 Baker Family Trust, Decedents Trust, for about $44,190. I did not sign checks for my brother's distributions.[72]
    4.5.    The third was for a distribution to me from the 1982 Baker Family Trust, Share A, in June 2002 for $300,000.[73] My brothers' distributions were transferred by Cohen, as shown on May 2002 AEFA statements.[74]
    4.6.    Cohen deposited a check for a distribution due me personally according to the terms of the 1982 Baker Family Trust, Decedents Trust, into the Robert Baker Trust account on about 5/15/2000. The check amount was $38,000, and Allen and Frank had also received equal distribution checks which also show on the May 2000 AEFA statements as clearing on 5/15/2000. AEFA produced account documentation shows a copy of the check with deposit instructions. Also on this document is a note in Cohen's handwriting, noting that this was my share of a portion of the proceeds from the sale of Kate Baker's home. Also noted was that he deposited it into the Robert Baker Trust, since I did not return a call from Allen. This note was written next to the signature line of the check, upon which my name was signed.[75] I did not sign this check, nor did I have knowledge of it until produced by AEFA.
    4.7.    Copies of checks and drafts written on 1982 Baker Family Trust accounts prior to Kate Baker's death were not produced.

5.    Kate Baker's name is signed on a Letter of Authorization instructing Putnam to liquidate over $1,000,000 in mutual fund accounts. Her name is signed as endorsement for multiple checks from Putnam used to fund two annuities on about January 25, 2000. Her name and initials are signed on annuity contracts for these two annuities on about January 25, 2000. During this time period, hospice records show she is "actively dying". An annuity with account number 9300-6516-233-9 was purchased for the 1982 Baker Family Trust, Share A. An annuity with account number 9300-0651-6230-5-004 was purchased for the 1994 Baker Family Limited Partnership.[76]

6.    Kate Bakers name was signed on a January 4, 2000 transfer request for funds transfer from the 1982 Trust Share A to unknown account 019-1283-9613-2-013. One year earlier, on 1/12/99, her name appears as signature authorizing a regular monthly transfer, noting 'Application Attached' for the unknown account number. No such application was produced.[77]

## Information and evidence from other lawsuits against AEFA

Bennett & Fairshter issued subpoenas for documentation related to at least two other lawsuits against AEFA, in progress during 2005. They referred to these lawsuits as 'National Cases' against AEFA, and argued in their NASD motions that there appeared to be a national pattern of deceptive behavior by AEFA to reward their financial advisors for selling AEFA proprietary funds and annuities which profited AEFA and yielded reduced returns to their customers, when compared to comparable non-AEFA investments. One such case was brought by the New Hampshire Secretary of State, including a Cease and Desist Order against AEFA, which includes AEFA internal communications which begin to document this pattern.[78]